Western Union Telegraph Company *v.* McLaurin.

[66 South. 739.]

Telegraphs and Telephones. *Liability for disclosure of messages. Immoral transactions.*

> A telegraph company cannot be held liable in damages for the disclosure of the contents of a message, where the object of the message was for the purpose of promoting an illegal or immoral act.

Appeal from the circuit court of Lauderdale county. Hon. Jno. L. Buckley, Judge.

Suit by J. D. McLaurin against the Western Union Telegraph Company. From a judgment for plaintiff, defendant appeals.

The facts are fully stated in the opinion of the court.

*Harris & Potter,* for appellant.

We concede that a wrong doer cannot set off against an injured party, that he too is a public offender in another distinct transaction, but in this case the telegrams in question were concerned and appellee's whole damage arose out of his unlawful cohabitation, and it is clear that if the character of Alice and appellee's unlawful relation with her were out of the case there could have been no recovery for punitive damages. *Cocke* v. *Telegraph Co., supra.* The immoral conduct of appellee with Alice must be shown as the basis for his alleged actual damages and in aggrevation of the damages by way of punishment, or the case is one for only nominal damages. The case could not travel to a successful determination without the odor and strengthening of appellee's illicit intercourse.

The question that we here present is, Can the appellee have a recovery for damages that arose out of his own

immoral and unlawful conduct? In *Way* v. *Foster,* 1 Allen 408, the court says: "The general doctrine that courts will not permit a party to prove his own illegal acts, in order to establish his case, is well established. They cannot listen to such proof consistently with the respect which they owe to the law and to themselves as its officers, nor has a party who acts in defiance of law any just claim to its agency in obtaining redress for damages he may have sustained in the course of his illegal transaction."

In *Gilmore* v. *Filler,* 60 L. R. A. 286, where one of the party engaged in a charivari negligently injured one of his companiions, the court held that the plaintiff could not be relieved in law from the consequences of his own wrong, saying: "The principle of public policy is this: *Ex dolo malo oritur actio.* No court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act."

In *Holt* v. *Green,* 73 Pa. Ct. 198, the court says: "The test whether a demand connected with an illegal transaction is capable of being enforced at law, is whether the plaintiff requires the aid of the illegal tranasaction to establish his case. If the plaintiff cannot open his case without showing that he has broken the law, a court will not assist him. It has been well said that the objection may often sound very ill in the mouth of the defendant, but it is not for his sake that the objection is allowed. It is founded upon principles of policy, which he shall have the advantage of contrary to the real justice between the parties. That principle of public policy is that no court will lend its aid to a party who grounds his action upon an illegal act. The principle to be extracted from all the cases is that the law will not lend its support to a claim founded on its own violation." *Devor* v. *Knonar,* 84 Ill. App. 184. "It is the established law that where a plaintiff's own unlawful act concurs in causing the damage that he complains of, he cannot receive compen-

sation for such damage." *Heland* v. *Lowell,* 3 Allen 407.
"A person cannot make his own illegal act the foundation of a legal right." Cooley on Torts, p. 44.

"The general principle is undoubted that a court of justice will not assist a person, who has participated in a transaction forbidden by law, to assert a right growing out of it, or to relieve himself of the consequences of his own unlawful act." *Harris* v. *Hartfield,* 71 Ill. 298.

"The law will not allow a profit from the result of wickedness, on the ground that such a result is antagonistic to public policy." *O'Conner* v. *Press Pub. Co.,* 70 N. Y. Sup. 367. Appellees case shows that by reason of the disclosure, his sin was found out and he became ashamed and mortified at his conduct and abandoned his improper life and sought another place. And as his alleged actual damages arose out of his unlawful and immoral conduct there could be no recovery on that account.

*F. V. Brahan,* for appellee.

It makes no difference under the law, whether telegrams were immoral or not, the defendant accepted them, and it was bound to transmit and deliver them, and keep their contents secret from the world. 23 Cyc., page 1684, paragraph "E," Duty Not To Disclose. The case reported in 120 Federal Reporter, page 550, has some application to this case; it being a case, where a telegram about the sale of a horse was disclosed, and damages recovered. I think the court properly gave the three instructions asked by plaintiff, with some slight modifications, and also properly refused the defendants instructions for a peremptory, and all others asked by defendant, and refused.

If there are any chances under the law, where the defendant should be held liable for disclosing the contents of messages committed to its keeping, I submit, that this is one of them, and I think it is a wise law and our courts

should approve it, and I ask, that this case be affirmed, as in my judgment, the defendant got off light with a verdict of five hundred dollars, which was due evidently to the erroneous ruling of the judge, in admitting testimony for defendants, and if he had recovered the full amount of three thousand dollars sued for, I do not believe this court would have required a *remittitur* on this record.

Cook, J., delivered the opinion of the court.

This case was begun by appellee against appellant to recover damages for injuries caused by appellant disclosing the contents of two telegrams. The messages were sent from Selma, Alabama, to appellee at Toomsuba, Mississippi, and were in the following words:

(1) "Call me up at once at 9196. [Signed] Alice."

(2) "Please come home, I am sick. [Signed] Alice."

The first message was dated November 3, 1912, and the second November 4, 1912, and each was delivered to the sendee on the day of their date.

The first telegram was written on a tissue paper train sheet and folded on itself, but was not placed in an envelope or sealed. This message was delivered to a third party by appellant, and the evidence discloses that the third party did not open or read the message. The second message was delivered by the telegraph company to a sister of the sendee, about eleven years of age, and was by her first delivered to her mother, who opened and read it, and it was then delivered to appellee. The last message was written on the same kind of paper as the first, and was not sealed or inclosed in an envelope. After reading the message, appellee's mother asked him if he was married to the sender of the telegram, and it seems from the evidence that she pursued this line of inquiry far enough to learn that "Alice" was a prostitute, and that her son had been her paramour.

It also appears that the messenger of the company at Selma disclosed the contents of the telegraphic corres-

pondence to the friends of appellee at Selma, and it is alleged and proven that his relations with the woman of the underworld thus became public property to his humiliation and shame, caused him to lose caste with women of respectibility, and ultimately forced him to resign a lucrative position at Selma to take another elsewhere less lucrative and pleasant. The wags of his acquaintance, after the disclosure of the contents of the messages, commonly called him "Alice," and the urchins of the street promptly tagged him with the same sobriquet. In short, the record tells a story that appeals to the sympathy of the sternest moralist. There can be no doubt that, when his sins had thus found him out, appellee suffered not only mentally, but also financially. Doubtless, the messenger boy did not appreciate the enormity or the consequences of his offense when he satisfied the curiosity of inquiring feminine friends of appellee by disclosing that "Alice" was a demirep and appellee was her Don Juan.

We refrain, for obvious reasons, from a further statement of the harrowing details of appellee's humiliation when it dawned on him that he had been exposed, found out, caught. Will the law compensate him for his injured feelings, or for his damaged exchequer, is the question.

It may be suggested that had the disclosures not been made, in all probability, appellee would have continued to stray in the primrose paths of dalliance; whereas, and since the "blessed sunlight of publicity" has caused him to abandon the pleasures of sin, appellee is in fact the winner rather than a loser; but, as the telegraph company does not file this as an offset, we will not consider that feature of the case.

"The test whether a demand connected with with an illegal transaction is capable of being enforced by law is whether the plaintiff requires the aid of the illegal transaction to establish his case." *Swan* v. *Scott,* 11 Serg. & R. (Pa.) 164; *Thomas* v. *Brady,* 10 Pa. 170; Scott 1. Duffy, 14 Pa. 20.

If a plaintiff cannot open his case without showing that he has broken the law, a court will not aid him. It has been said that the objection may often sound very ill in the mouth of the defendant, but it is not for his sake the objection is allowed; it is founded on general principles of policy which he shall have the advantage of, contrary to the real justice between the parties. The principle of public policy is that no court will lend its aid to a party who grounds his action upon an immoral or illegal act.

The principle has been applied in numerous cases wherein its application seems to have been of doubtful propriety, but the principle as stated is undoubtedly sound in logic, and necessarily affords the true test for the guidance of the courts.

Speaking of the principle here invoked, Judge COOLEY, in his valuable work on Torts (volume 1, marginal page 172), says:

"It may be thought that the maxim that the law will not relieve a party from the consequences of his own wrongdoing partakes more of severity to the particular person singled out by the plaintiff for pursuit, than it does of general justice. It may be right to punish him, but is it right to exempt from punishment others equally guilty? If strict justice, as between individuals, were all that was aimed at, we should be compelled to answer this question in the negative; and we must therefore look further for the reason of this rule."

The author then proceeds to state the reasons for the rule, as he sees it, this way:

"It has already been intimated that the rule, as we have given it, is one of very general application, and not by any means confined to cases of joint torts. Whoever, by his pleadings in any court of justice, avows that he has been engaged with others in an unlawful action, or has concerted with them in an unlawful enterprise, and that in arranging for or carrying it out he has been un-

fairly treated by his associates, or has suffered an injustice which they should redress, will be met by the refusal of the court to look any further than his complaint, which it will at once order dismissed. The following reasons may be assigned for this action: (1) The discouragement of all illegal transactions by distinctly apprising every person who engages in them that the risk he incurs is not merely of being compelled to share with the others the loss that may follow, for this, in many cases, would be insignificant, and in all cases would be small in proportion to the size and formidable character of the combination. He is therefore given to understand that whoever takes part in an illegal transaction must do so under a responsibility only measured by the whole extent of the injury or loss; an understanding very well calculated to make men hestitate who, under a different rule, would be disposed to give full scope to evil inclinations. But (2) the state, from a consideration of its own pecuniary interests, and of the interests of other litigants, may wisely refuse to assist in adjusting equities between persons who have been engaged in an unlawful action. The expense of administering justice is always a large item in the state's exependitures, and one which must be borne by the common contributions of the people. Where one has suffered from participation in an unlawful undertaking, what justice can there be in any demand on his part that the state shall supply courts and officers and incur expenses to indemnify him against a loss he has encountered through a disregard of its laws? Here the question is not merely one of what is right, as between himself and his associates, but what is best for the interests of the state. When that question is up for consideration, the fact is not to be overlooked that there are unavoidable difficulties and necessary evils connected with litigation which multiply rapidly as the cases increase in number. Courts and juries, at the best, are but imperfect instruments for the accomplishment of justice;

and the greater the volume of litigation, the less is the attention which any particular case is likely to receive, and the greater the probability that right may be overcome by artifice, or by a false and deceptive exposition of the facts. Trusty justice must follow after wrong with deliberate and measured tread; and every honest litigant in seeking it must be more or less impeded, when those who have no just claim on the consideration of the court are allowed to push their complaints before it. It is not necessary to look further for reasons in support of the rule to which attention has been directed.''

Judge Cooley was discussing joint wrongs where the parties were engaged in a common enterprise, but we can see no reason why the reasons given by him for the enforcement of the principles should not apply in the present case. It is clear from the record that plaintiff's injuries, his humiliation, and shame, sprang from his illicit relations with the woman in the case. But for his immoral commerce with the lady of easy virtue, there would have been no shame, no humiliation, and the disclosure of the contents of the telegrams would have caused no pain—no injury to his reputation. His claim for actual damages is grounded upon and has no foundation save for the fact that he has been violating the Seventh Commandment.

For the reasons mentioned, we are of opinion that plaintiff did not prove any actual damages which would entitle him to invoke the process of the courts. The telegraph company did, however, violate its public duties. Policy requires that a public service corporation should be held responsible for the willful violation of its duties to those entitled to command its services. Punitive or exemplary damages are authorized in proper cases upon the theory that punishment will deter others from committing willful and wanton wrongs. Punitive damages are not given for the purpose of compensating or enriching individuals, but for their supposed deterrent effect.

In the present case the plaintiff has not shown himself to be entitled to compensation, because this record shows that he wants to be paid for his humiliation, which was brought about by his immoral acts. In the eyes of the law, he has suffered no injury which the courts will aid him to repair. Does it follow that the courts will also decline to penalize the confessedly wanton act of the defendant, because the wrong was done to one who can show no actual damages of which courts will take notice, and because the plaintiff will get the benefit of the award?

The plaintiff cannot travel to actual damages without the aid of his immoral acts, and it is the policy of the state to deny the plaintiff the assistance of the courts for the recovery of such damages. On the other hand, public policy permits the imposition of punitive damages in the interest of the public, without regard to the pecuniary interests of the individual suing.

We think the apparently conflicting principles may be harmonized by holding that, when it appears that plaintiff's right of recovery is based upon his own wrongs, the courts will bring his case to an end and disregard the wrongs of the defendant. Exemplary damages are never recoverable as a matter of right. It is always within the discretion of the jury to refuse to find for such damages. In cases like the present one, we believe that the case should end because the aid of the court cannot be invoked at all to adjust the differences in dispute.

The publication of the telegrams did not disclose the character of the sender. It was necessary for the plaintiff's case that he should disclose her business (if this is the proper word for this sort of traffic), in order that he might thereby show that he was injured. He could not "open his case" without confessing his criminal intimacy with the courtesan, and it was his relations with the woman that brought about his shame—and it was this shame which produced the injury, or actual damages.

It was wrong, of course, for the telegraph company to disclose the contents of the telegrams, but the disclosure would not and could not cause any actual injury to complainant, except for his own immoral practices.

Leaving out of view the immorality of plaintiff, the wrongs of the company did not injure plaintiff. Without the aid of his immoral relations with the scarlet woman, he cannot show any injury to his self-respect. · It thus appears that the courts will not entertain this action at all, although it may appear that the telegraph company has been guilty of a wanton disregard of its public duties. The state will not undertake to punish the wrong because the plaintiff who brings the controversy into court comes with unclean hands, and the court can enter no judgment except such judgment as will rid it of this entire litigation.

*Reversed and dismissed.*