Susan **MORRISON**, f/k/a Susan Clark, Plaintiff,

v.

**Eric J. McCANN**, individually, and **Eric J. McCann, P.C.**, jointly and severally, Defendants.

No. 01–CV–74326.

United States District Court, E.D. Michigan, Southern Division.

Dec. 2, 2003.

648

William R. Seikaly, Seikaly & Stewart, Bloomfield Hills, MI, Michael J. Lebow, Harnisch, Lebow, Bingham Farms, MI, for plaintiff.

C. William Garratt, Garratt Law Firm, C. William Garratt, Garratt & Bachand, Bloomfield Hills, MI, for defendants.

Melvin R. Schwartz, Southfield, MI, for movants.

## ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

BORMAN, District Judge.

This is a case involving a legal malpractice claim. Now before the Court is Defendants' Motion for Summary Judgment. The Court heard oral argument on November 25, 2003. Having considered the entire record, and for the reasons that follow, the Court DENIES the Defendants' Motion for Summary Judgment.

## FACTS

### A. Factual Background

This is a dispute initiated by the Plaintiff, Susan Morrison, f/k/a Susan Clark ("Plaintiff"), concerning alleged legal malpractice by Defendants, Eric J. McCann and Eric J. McCann, P.C. (collectively, "Defendants"), that resulted in the dismissal with prejudice of a prior medical malpractice claim brought by Plaintiff.

In November 1998, Plaintiff entered into an attorney-client relationship with the Defendants whereby the Defendants agreed to represent her in a medical malpractice claim against her former treating psychiatrist, Mary Robin Peters, M.D. ("Dr.Peters")[1]. Compl. ¶ 9–10. In her

---

1. A written agreement was signed by Plaintiff and Defendants on November 16, 1998 to memorialize the relationship. *Id.* at ¶ 10.

medical malpractice suit, Plaintiff contended that while under Dr. Peters' care, Dr. Peters initiated a sexual relationship with the Plaintiff that cost Plaintiff her marriage, destroyed her relationship with her son, caused her extreme emotional anguish, required her to seek continued psychological care, and, because of the tumultuous nature of the relationship, caused Plaintiff to leave the state of Michigan and move to Maine. Plaintiff's medical malpractice suit was dismissed with prejudice for the reasons discussed herein. Plaintiff's instant legal malpractice suit alleges the Defendants committed malpractice while representing Plaintiff in the medical malpractice suit.

Because a claim of legal malpractice requires a showing that, but for the attorney's malpractice, Plaintiff would have prevailed in the underlying medical malpractice suit, the facts relating to the underlying suit are set forth below.

**(1) Factual Background Giving Rise to the Underlying Medical Malpractice Suit**

In 1993, when Plaintiff's initial psychiatrist left the clinic in which Plaintiff was originally diagnosed and treating, Plaintiff's case was referred to another psychiatrist, Dr. Mary Robin Peters ("Dr.Peters"). Dep. Morrison at 244:18–21 (May 12, 2003). Thereafter, Dr. Peters continued to treat Plaintiff at various facilities in the metropolitan Detroit area. *Id.* at 245:8–15.

In March 1996, while under Dr. Peters' care, Plaintiff and Dr. Peters entered into a sexual relationship[2]. *Id.* at 50:18–25—51:1. In April or May, 1996, Dr. Peters ceased therapy sessions with Plaintiff in her office setting. *Id.* at 105:25—106:1–7. Plaintiff claims that Dr. Peters continued to prescribe medication for her despite the end of Plaintiff's therapy sessions. *Id.* at 106:6–7. Accordingly, Plaintiff contends that the doctor-patient relationship did not end when the sexual relationship began. *Id.* at pp. 105–106. Thus, Plaintiff and Defendants disagree as to when the doctor-patient relationship terminated. Defendants contend that the doctor-patient relationship ended in April or May 1996 when the therapy sessions ceased. Defs'. Mot. at 13[3]. Plaintiff contends the doctor-patient relationship lasted until September 1997. Pl.'s Resp. Br. at 3[4]. According to Plaintiff, the final sexual encounter, and end of the personal relationship between Plaintiff and Dr. Peters, occurred in early August 1997. Dep. Morrison at 10:7–11. For purposes of Defendants' motion for summary judgment, the Court must accept the facts most favorable to the non-moving party.

During the time that Plaintiff's therapy was conducted, Plaintiff was depressed and having problems in her marriage.

---

**2.** Dr. Peters maintained that she never entered into a sexual relationship with Plaintiff. Ex. 8 to Pl.'s Resp. Br.

**3.** Defendants support this allegation with the following: (1) Plaintiff testified that Dr. Peters told her in March 1996 that "she could continue to prescribe medication for [Plaintiff]. She could continue to help [Plaintiff] with the conflicts [Plaintiff] was dealing with, but it wouldn't remain in the same structure of the normal structure of being the office patient-doctor relationship." Dep. Morrison at 100:3–8; (2) Plaintiff testified that after April 1996,

Plaintiff was not billed, nor did she pay, for any treatment after April 1996. *Id.* at 251:11–17; and (3) Dr. Peters' records reflect the last date of in-office treatment was May 2, 1996. Ex. E to Defs'. Mot.

**4.** Plaintiff supports this allegation with an affidavit filed by Plaintiff, in which Plaintiff testified that Dr. Peters treated Plaintiff until September 1997. Ex. 11 to Pl.'s Resp. In addition, a police report was filed by Dr. Peters in which Dr. Peters acknowledges a doctor-patient relationship in March, 1997. Ex. 12 to Pl.'s Resp.

Dep. Morrison at 219. Plaintiff alleges that, in the fall of 1995, Dr. Peters encouraged Plaintiff to seek a divorce. *Id.* at 266:5–8. In January 1996, prior to Plaintiff's and Dr. Peters' first sexual encounter, Plaintiff and her husband, Donald Clark, ceased living together. *Id.* at 147:10–12. In June 1996, Plaintiff filed a complaint for divorce, which was granted on October 18, 1996. Exs. B and C to Defs'. Supp. Br.

In approximately June 1997, Plaintiff moved to Maine, but continued to visit Michigan on occasion over the next several months. Dep. Morrison at 7–9. Plaintiff permanently relocated to Maine from Michigan in February 1998. *Id.* at 7:2–5.

In October 1998, Plaintiff's Maine lawyer, Randall Smith, contacted the Defendants about representing Plaintiff in a medical malpractice claim against her former treating psychiatrist, Dr. Peters. Defs'. Mot. at 4. In the medical malpractice action, Plaintiff alleged she suffered damages, including the break-up of her marriage and her corresponding relocation to Maine, as a result of the sexual relationship between Plaintiff and Dr. Peters. *See* Ex. D to Defs'. Supp. Br.

On November 16, 1998, Plaintiff and Defendants entered into a written agreement whereby Plaintiff retained both Randall Smith and Defendants to represent Plaintiff in the medical malpractice action. Defs.' Mot. at 4; Ex. 4 to Pl.'s Resp. Br.

On November 23, 1998, the Defendants, on behalf of Plaintiff, filed a Notice of Intent to Sue, as required by M.C.L. § 600.2912b[5]. Compl. ¶ 12. The Defendants filed Plaintiff's medical malpractice claim in the Oakland County Circuit Court for the State of Michigan on July 15, 1999.

*Id.* at 13; *see also* Ex. D to Defs'. Supp. Br.

Michigan Compiled Laws Section 600.2912d provides, in pertinent part:

(1) Subject to subsection (2), the plaintiff in an action alleging medical malpractice or, if the plaintiff is represented by an attorney, the plaintiff's attorney shall file with the complaint an affidavit of merit signed by a health professional who the plaintiff's attorney reasonably believes meets the requirements for an expert witness under section 2169. The affidavit of merit shall certify that the health professional has reviewed the notice and all medical records supplied to him or her by the plaintiff's attorney concerning the allegations contained in the notice and shall contain a statement of each of the following:

(a) The applicable standard of practice or care.

(b) The health professional's opinion that the applicable standard of practice or care was breached by the health professional or health facility receiving the notice.

(c) The actions that should have been taken or omitted by the health professional or health facility in order to have complied with the applicable standard of practice or care.

(d) The manner in which the breach of the standard of practice or care was the proximate cause of the injury alleged in the notice.

M.C.L. § 600.2912(d)(1). Plaintiff's complaint was not accompanied by an affidavit of merit as required by Section 600.2912(d)(1). As a result, on October 21, 1998, Michigan Circuit Court Judge Steven N. Andrews dismissed Plaintiff's medical

---

**5.** M.C.L. § 600.2912 provides for civil malpractice actions against any person who holds himself or herself out as a state licensed professional. M.C.L. § 600.2912b(1) requires that written notice be given to health professionals prior to the commencement of a medical malpractice claim.

malpractice action. The Court held that the filing of a complaint, absent an affidavit of merit, was insufficient to commence a medical malpractice action. Ex. 7 to Pl.'s Resp. Br. Furthermore, under Michigan law, the filing of a complaint without an affidavit of merit did not toll the statute of limitations. *Id.* Because Plaintiff's claim was now time barred, the Court dismissed the complaint with prejudice. *Id.* The instant legal malpractice suit ensued.

### (2) Legal Malpractice Suit

On November 13, 2000, Plaintiff filed the instant legal malpractice suit against the Defendants. Plaintiff claims the Defendants breached the duty of care applicable to attorneys in the same or similar locale. Compl. ¶ 25. Plaintiff contends the duty of care included, and the Defendants breached, each of the following duties:

a. to refrain from handling the underlying case if it was beyond the defendants' competence;

b. to act as a reasonably prudent attorney would in the handling, investigation and prosecution of the matter for which defendants were retained; and, in particular to formulate a legal theory of the case consistent with the facts and prevailing law;

c. to observe the requirements of the law relative to the investigation and filing of legal claims and supporting documents in cases based on medical malpractice;

d. to obtain and/or file an affidavit of merit in a medical malpractice action as required by Michigan law;

e. to be honest and truthful with the client and in particular to inform the client of the important developments in the case, as well as options for further action;

f. to pursue appellate remedies or give timely advice to the client about such remedies so that they might be pursued by other counsel if the defendants were unable or unwilling to pursue them directly.

Compl. ¶ 27(a)-(f). As a result of these alleged breaches, Plaintiff claims she was denied any recovery of damages. Plaintiff claims that, if the medical malpractice claims were properly pursued, it is "more likely than not" that Plaintiff would have prevailed. Compl. ¶ 14.

### B. Procedural Background

On August 4, 2003, Defendants filed the instant motion for summary judgment. Defendants claim that, in order to prevail on her legal malpractice claims, Plaintiff must prove she would have been successful, absent the Defendants' alleged malpractice, on her medical malpractice claim. This, the Defendants contend, Plaintiff cannot do for three reasons: (1) Michigan law allows medical malpractice actions as a result of a sexual relationship only if the physician prescribed or induced the sexual relationship under the guise of treatment; (2) Plaintiff's underlying medical malpractice action is barred under the "wrongful conduct" rule; and (3) Plaintiff's medical malpractice claims were barred by the two-year statute of limitations ("SOL") before Plaintiff ever contacted Defendants for representation.

Plaintiff responds that there can be "little doubt" that the relationship was "induced" as a result of the treatment, thus Plaintiff's claim was purportedly cognizable under Michigan law. Plaintiff also argues that under *Rosenick v. Cham*, 2001 WL 776737 (Mich.App. January 16, 2001), the underlying case would not have been barred by the wrongful conduct rule because the parties were not equally culpable. Last, Plaintiff argues that the statute of limitations did not run until September 1997. Thus, Plaintiff's medical malpractice claim, filed in July 1999, was submitted within the statutory deadline.

The Defendants' reply focuses on the wrongful conduct and statute of limitations arguments. As to the former, the Defendants argue that *Rosenick* does not have precedential value and, even if it does, the issues in this case are factually and legally distinguishable. Defs'. Reply at 1. With regard to the latter, the Defendants contend that the SOL did not begin to run, as Plaintiff asserts, after September 1997. Instead, the SOL began to run when the doctor-patient relationship ended, allegedly in April 1996.

On November 6, 2003, the Defendants filed a supplemental brief in which they argue that the end of the doctor-patient relationship is actually irrelevant to the SOL issue. Instead, Defendants assert that, under Michigan law, a medical malpractice claim accrues at the time of the act or omission giving rise to the medical malpractice claim. Defendants argue that Plaintiff's claim that she was emotionally damaged by the sexual relationship with Dr. Peters, accrued in March, April, or May 1996, when the relationship began. Plaintiff's claim that Dr. Peters caused the breakdown of Plaintiff's marriage accrued, at the latest, on October 18, 1996, when Plaintiff's divorce was granted. Thus, the SOL allegedly expired prior to the commencement of the attorney-client relationship between Plaintiff and Defendants.

## ANALYSIS

For the reasons that follow, the Court DENIES Defendants' motion for summary judgment.

### I. Standard of Law

#### A. Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof." FED. R. CIV. P. 56(b). Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

> Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548; *Gutierrez v. Lynch,* 826 F.2d 1534, 1536 (6th Cir.1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.,* 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed.1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Id.; Feliciano v. City of Cleveland,* 988 F.2d 649, 654 (6th Cir.1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.,* 749 F.2d 1205, 1210–11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed.R.Civ.P. 56(c). The rule requires the non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd Cty. Bd. of Ed.*, 106 F.3d 135, 145 (6th Cir.1997); *see also Anderson*, 477 U.S. at 252, 106 S.Ct. 2505 (holding that the non-moving party must produce more than a mere scintilla of evidence to survive summary judgment).

### B. Legal Malpractice

■ "In order to establish a claim of legal malpractice, a plaintiff must prove (1) the existence of an attorney-client relationship, (2) negligence in the legal representation of the plaintiff, (3) that the negligence was the proximate cause of any injury, and (4) the fact and extent of the injury alleged." *Estate of Mitchell v. Dougherty*, 249 Mich.App. 668, 676, 644 N.W.2d 391 (2002)(citing *Charles Reinhart Co. v. Winiemko*, 444 Mich. 579, 585–86, 513 N.W.2d 773 (1994)). To prove proximate cause in a legal malpractice action, a plaintiff must "establish that the defendant's action was a cause in fact of the claimed injury." *Winiemko*, 444 Mich. at 586, 513 N.W.2d 773. Thus, a plaintiff must show that "but for the attorney's alleged malpractice, he would have been successful in the underlying suit." *Id.* "To hold otherwise would permit a jury to find a defendant liable on

the basis of speculation and conjecture." *Id.* at 586–87, 513 N.W.2d 773.

While the parties do not expressly state that the 'proximate cause' element is at issue in the instant motion for summary judgment, the parties arguments focus on whether Plaintiff would have prevailed in the underlying medical malpractice claim, absent Defendants' conduct. As a practical matter, if Plaintiff's medical malpractice claim lacked merit or was barred by other equitable or procedural considerations, then Plaintiff would not have been successful in the underlying suit, and Plaintiff's legal malpractice claim must be dismissed.

In support of the Defendants' motion for summary judgment, the Defendants assert Plaintiff would not have been successful in her medical malpractice suit for three separate and independent reasons. First, the Defendants argue that, under Michigan law, medical malpractice claims arising out of sexual relationships between the physician and patient are valid only if the doctor prescribed or induced the sexual relationship under the guise of treatment. Second, Defendants argue that Michigan's "wrongful conduct" rule barred Plaintiff's recovery because Plaintiff must rely on her own wrongful conduct (adultery) in order to establish the cause of action. Last, Defendants assert that Plaintiff's medical malpractice claim was barred by the statute of limitations. A finding in the Defendants' favor on any of these grounds requires this Court to grant summary judgment in favor of the Defendants. Each argument will be discussed in turn.

### II. Michigan Law Requires A Doctor to Prescribe or Induce a Sexual Relationship as Treatment

■ The Michigan Court of Appeals has recognized that medical malpractice claims arising out of sexual relationships with one's patient are proper when the patient

alleges that the physician induced the sexual relations as part of the patient's therapy. *Cotton v. Kambly*, 101 Mich.App. 537, 300 N.W.2d 627 (1980). In *Cotton*, the plaintiff initiated a medical malpractice case against her doctor based on allegations that her doctor induced her to engage in sexual relations with him as part of her prescribed therapy. *Cotton*, 101 Mich. App. at 541, 300 N.W.2d 627. The Michigan Court of Appeals held that the Plaintiff's claim sounded in medical malpractice and was not barred by statutes that abolished the civil cause of action for seduction. *Id.* at 540–42, 300 N.W.2d 627. Central to the Court of Appeals' holding was its reliance on *Roy v. Hartogs*, 85 Misc.2d 891, 381 N.Y.S.2d 587 (1976), which held that the plaintiff asserted a viable medical malpractice action when she alleged her psychiatrist engaged in sexual intercourse with her as part of her prescribed therapy. *Id.*

The *Cotton* Court did not, however, hold that such an allegation was essential to a medical malpractice claim. It was not necessary for the *Cotton* Court to reach that issue because the plaintiff explicitly alleged that the sexual relationship was integral to the plaintiff's treatment. *Id.* Likewise, the *Cotton* Court did not reach the question of whether merely having a sexual relationship contemporaneously with a patient's treatment was sufficient to sustain a malpractice action.

However, the Sixth Circuit Court of Appeals, relying on *Cotton* and *Roy*, has held that, in order to establish a medical malpractice claim based upon a doctor-patient sexual relationship, a patient must allege that the physician induced sexual relations as part of, or under the guise of, therapy. *Jennings v. Friedman*, 875 F.2d 864, 1989 WL 54766, *2 (6th Cir.1989)(unpublished opinion)[6]. In *Jennings*, the plaintiff-patient was treated by the defendant-doctor for a back ailment. During her treatment, the doctor invited the patient to his office to have sexual intercourse. *Id.* at 1. Weeks later, a second sexual encounter occurred. *Id.* The plaintiff did not allege, and did not produce evidence, that the sexual relations occurred under the guise of medical care or treatment. *Id.* at 2. In fact, in her deposition, the plaintiff conceded the sexual encounter was unrelated to the plaintiff's medical treatment[7]. *Id.* That is clearly not the case here.

The Sixth Circuit opinion in *Jennings* affirmed the district court's holding of summary judgment in favor of the defendant because " 'allegations of sexual relations between a physician and his or her patient during the course of treatment do not state a claim for medical malpractice unless the sexual relations were initiated under the guise of treatment of the patient.' " *Id.* at 1. The Court observed, "we find no breach of a duty of care within the scope of the patient/physician relationship.

---

**6.** Other courts have similarly held that in order to state a valid medical malpractice claim based on a sexual relationship between doctor and patient, a plaintiff must have been induced into the sexual relationship under the guise of treatment. *See Atienza v. Taub*, 194 Cal.App.3d 388, 239 Cal.Rptr. 454 (2d Dist.1987)(holding medical malpractice action lies only if the sexual relationship was initiated under the guise of treatment by the physician); *Odegard v. O. Finne, III*, 500 N.W.2d 140 (Minn.App.1993)(holding the dispositive fact in medical malpractice action

was that the plaintiff was not induced into a sexual relationship with her doctor as part of her treatment.).

**7.** In a footnote, the Sixth Circuit referred to a passage from the plaintiff's deposition in which the plaintiff refuted any connection between the sexual relationship and treatment. For example, in response to the question, "There was no connection with any medical treatment, was it?", Plaintiff answered, "no." *Jennings*, 1989 WL 54766, at *2, n. 3.

Although possibly unethical and a violation of the Hippocratic oath, Defendant's actions did not constitute medical malpractice." *Id.* at 2.

Unlike the facts in *Jennings*, in this case, Plaintiff has produced evidence to support a genuine issue of material fact that the sexual relationship was induced by Dr. Peters as part of Plaintiff's therapy. Defendants correctly assert that there is no evidence that Dr. Peters explicitly stated that she prescribed the sexual relationship as part of Plaintiff's treatment. Nevertheless, viewing the evidence in a light most favorable to the Plaintiff, the Court finds ample evidence that Plaintiff was induced into a sexual relationship with Dr. Peters under the guise of therapy.

First, the evidence demonstrates that the sexual relationship between Plaintiff and Dr. Peters began during the doctor-patient relationship that included treatment relating *inter alia* to Plaintiff's marital relationship. Dep. Morrison at 244:18–21, 245:8–14 (Plaintiff was referred to Dr. Peters after Plaintiff's original psychiatrist left the clinic in 1993 and Dr. Peters continued Plaintiff's treatment thereafter); *Id.* at 50:18–25—51:1 (stating sexual relationship began in March 1996). Plaintiff's treatment was not terminated when the professional doctor-patient relationship evolved into a personal relationship. *Id.* at 100:3–8 (Plaintiff stated that Dr. Peters told her she "could continue to prescribe medication for me" and "could continue to help [Plaintiff] with the conflicts was dealing with" despite the personal relationship.); *see also Id.* at 106:5–7 (Plaintiff states that while therapy was terminated "in the office", Dr. Peters "was still my doctor.")

During Plaintiff's treatment, Dr. Peters prescribed that Plaintiff take large doses of several drugs as part of her therapy;

anti-depressants Prozac (60 mg) and Wellbutrin (150 mg, three times per day), as well as Ritalin (10 mg, three times per day). *Id.* at 172–79; *see esp.* p. 175. Dr. Peters' medical prescription treatment of Plaintiff continued after the office visits terminated. Plaintiff stated that "not too many family practitioners...would feel comfortable" with the quantities that Dr. Peters' prescribed for Plaintiff[8]. *Id.* at 175:5–7. Indeed, Plaintiff's husband expressed concern over the quantities that Dr. Peters prescribed for Plaintiff. Dep. Clark at 17:13–21 (June 10, 2003)(stating that, prior to their divorce and during Dr. Peters' treatment of Plaintiff, "she was taking a lot of medication...I thought [Dr. Peters] gave her an awful lot of medication.")

Additionally, Dr. Peters degraded Plaintiff's husband in front of Plaintiff during a therapy session which Plaintiff's then-husband, Donald Clark, attended. *Id.* at 20:11–25—21:1–15. Clark testified that he attended only one therapy session because "one was enough." *Id.* at 20:15. He stated that Dr. Peters "gave [him] one of the dirtiest looks [he'd] ever seen" and that when he began speaking, "Peters came on me like ugly on an ape." *Id.* at 20:25—21:1. Clark testified further that it "was like [Dr. Peters] did not want me there." *Id.* at 21:12–13. Indeed, Dr. Peters counseled Plaintiff to get a divorce and often put down Plaintiff's husband during therapy sessions. Dep. Morrison at 261:4–5—264:11–21 (Plaintiff stated that according to Dr. Peters, "Don was always wrong" and "it was never my fault."). Clark testified that Plaintiff was "taken by Dr. Peters" who was giving her all this special attention; Plaintiff looked up to her. Dep. Clark at 47. Clark testified that Dr. Peters slotted Plaintiff into her last session of the day to allow extra time for their meet-

---

**8.** It appears that Plaintiff made this assertion based on her experience as a registered nurse.

ings. The session would run over at no extra charge. *Id.* at 9.

Clark also testified that Dr. Peters was calling his wife at home during late night hours, i.e., 11:00 p.m., and talking for long periods of time. *Id.* at 43:1–10. Plaintiff testified that Dr. Peters would call her house nonstop, and leave messages all the time. Dep. Morrison at 190.

Viewing this evidence in a light most favorable to the Plaintiff, there is a genuine issue of material fact that Plaintiff was induced, as part of her therapy, to engage in a sexual relationship with Dr. Peters. Taking Plaintiff's allegations as true, Plaintiff was heavily medicated by Dr. Peters throughout her treatment, well beyond the termination of her office visits. In addition, during therapy sessions, Dr. Peters consistently insulted Plaintiff's husband and degraded him in Plaintiff's presence. Dr. Peters also counseled Plaintiff to divorce her husband. Dr. Peters pursued Plaintiff with multiple calls at her home, including late night calls. Indeed, Dr. Peters carried her obsessive pursuit of Plaintiff by calling the police one afternoon in 1997 when she could not locate her patient, to wit, Plaintiff. Under these conditions, a jury could reasonably conclude that Plaintiff was induced into a sexual relationship with Dr. Peters as part of her treatment program.

The Court notes that Plaintiff, after having been prescribed significant quantities of drugs by Dr. Peters, thereafter forged prescriptions with Dr. Peters' name to obtain the drugs when they were apart, and before Plaintiff was able to secure psychiatric care including drug prescriptions in Maine. Dep. Morrison at pp. 173—179; see esp. p. 176. This conduct, albeit unlawful, indicates a dependence on drugs that was initially created by Dr. Peters' prescription treatment. *Id.* at 123. Plaintiff testified that Dr. Peters knew she was forging her signature on prescriptions, and

that on one occasion, Peters gave her permission to do it. *Id.* at 177–79. Plaintiff's allegations, and the evidence before the Court, supports a claim that the sexual relationship with Dr. Peters was induced by and through her treatment, thereby giving rise to a valid medical malpractice claim. Plaintiff has produced evidence to raise a genuine issue of material fact regarding proximate cause—an essential element of the instant legal malpractice claim.

## III. Wrongful Conduct

■ Next, Defendants claim Plaintiff's legal malpractice case must be dismissed because the common law "wrongful conduct" rule would prohibit Plaintiff from maintaining the underlying medical malpractice action. The Defendants claim that Plaintiff committed adultery, a felony under Michigan law, when she engaged in a sexual relationship with Dr. Peters, and that the adulterous relationship caused the damages Plaintiff sought in her medical malpractice claim (i.e., loss of marriage and related financial losses). Defs'. Mot. at 9–10. Defendants assert that, under the wrongful conduct rule, Plaintiff's own illegal conduct precludes recovery on her medical malpractice claim. *Id.* Defendants appear to argue that a psychiatrist can have a sexual relationship with any married patient under the guise of therapy, and escape consequences because that married person is an adulterer. The Court concludes that as to this defense— "this dog does not hunt."

In addition, Plaintiff contends that the wrongful conduct defense does not bar her recovery because an exception to the rule applies where the parties are not *in pari delicto*, not equally culpable in the illegal conduct. Pl.'s Resp. Br. at 6–9. Michigan courts have long recognized the existence of the wrongful conduct rule. *Orzel v. Scott Drug Co.*, 449 Mich. 550, 558, 537 N.W.2d 208 (Mich.1995). The wrongful

conduct rule prohibits a plaintiff from maintaining an action "if, in order to establish his cause of action, he must rely in whole or in part, on an illegal or immoral act or transaction to which he is a party." *Id.* The rule is based on the rationale that "courts should not lend their aid to a plaintiff who founded his cause of action on his own illegal conduct." *Id.* at 559, 537 N.W.2d 208. Michigan courts have extended the principle that one should not profit from his own wrong, to tort actions where the plaintiff seeks compensation for injuries resulting from their own illegal activities. *Id.* at 560, n. 9, 537 N.W.2d 208.

The wrongful conduct rule has certain limitations and exceptions. To implicate the wrongful conduct rule, "the plaintiff's conduct must be prohibited or almost entirely prohibited under a penal or criminal statute." *Id.* at 561, 537 N.W.2d 208. While traffic and safety law violations do not "rise to the level of serious misconduct sufficient to bar a cause of action," *id.* at 561, 537 N.W.2d 208, the Michigan Court of Appeals has held that adultery warrants application of the rule. *Stopera v. DiMarco,* 218 Mich.App. 565, 569–70, 554 N.W.2d 379 (Mich.App.1996).

In addition, the rule requires a sufficient causal nexus between the plaintiff's illegal conduct and the plaintiff's asserted damages. *Orzel,* 449 Mich. at 564, 537 N.W.2d 208. The plaintiff's "injury must have been suffered while and as a proximate result of committing an illegal act. The unlawful act must be at once the source of both his criminal responsibility and his civil right. The injury must be traceable to his own breach of the law and such breach must be an integral and essential part of his case. Where the violation of law is merely a condition and not a con-

tributing cause of the injury, a recovery may be permitted." *Id.* at 565, 537 N.W.2d 208 (citing *Manning v. Noa,* 345 Mich. 130, 136, 76 N.W.2d 75 (1956)).

Even if the rule applies, two exceptions exist to the rule. The first, which is inapplicable to the case at bar, exists where the statute the defendant allegedly violated allows the plaintiff to recover for the injury suffered because of the violation. *Id.* at 570, 76 N.W.2d 75. A second exception exists if, although both parties engaged in the illegal conduct, the defendant was significantly more culpable than the plaintiff. *Id.* at 569–70, 76 N.W.2d 75.

### A. Illegal Conduct

As noted above, the Michigan Court of Appeals held that the criminal adultery statute [9], although regularly violated and rarely enforced, implicates the wrongful conduct rule. *Stopera,* 218 Mich.App. at 569–70, 554 N.W.2d 379. In this case, Plaintiff admits that, while she was married to her now ex-husband, Donald Clark, she engaged in an adulterous sexual relationship with Dr. Peters. *See* Dep. Morrison at 50–52 (admitting sexual relationship began in March 1996); Exs. B and C to Defs'. Supp. (Ex. B, Complaint for divorce filed on June 25, 1996; Ex. C, Divorce Judgment filed on October 18, 1996). Therefore, the wrongful conduct rule may apply to bar Plaintiff, who committed adultery, from maintaining a cause of action based upon damages arising out of that relationship. *Id.*

### B. Causal Connection

In the underlying medical malpractice complaint, Plaintiff asserted that, as a result of her adulterous relationship with Dr. Peters, Plaintiff's marriage was destroyed,

---

9. M.C.L. § 750.30, entitled, "Adultery; punishment", criminalizes adultery and states, "Any person who shall commit adultery shall be guilty of a felony; and when the crime is committed between a married woman and a man who is unmarried, the man shall be guilty of adultery, and liable to the same punishment."

her relationship with her son was ruined, and she suffered related financial losses. Ex. D to Defs'. Supp. Br. at 3. Plaintiff also asserted that the sexual relationship has caused Plaintiff's mental health to deteriorate and "extreme emotional anguish". *Id.* Thus, Plaintiff's injuries were suffered "while and as a proximate result of committing an illegal act." *Orzel,* 449 Mich. at 565, 537 N.W.2d 208; *see also Stopera,* 218 Mich.App. at 569–70, 554 N.W.2d 379 (reversing summary judgment based on culpability exception to wrongful conduct rule, but impliedly holding that adulterous relationship proximately caused plaintiff's damages); *Correll v. St. John Hospital–Macomb Center,* 2002 WL 226935 (Mich. App. Feb.8, 2002)(affirming summary judgment based on wrongful conduct rule in malpractice case arising out of adulterous counselor-patient relationship) [10].

### C. Culpability Exception to the Wrongful Conduct Rule

The culpability exception to the wrongful conduct rule exists where, although both parties engaged in illegal behavior, the parties are not equally culpable, and the defendant's culpability is greater than the plaintiff's. *Rosenick,* 2001 WL 776737 at 2. The exception applies only where the case involves a defendant who is "significantly" more culpable than the plaintiff. *Correll,* 2002 WL 226935 at 2 (citing *Stopera,* 218 Mich.App. at 571, n. 5, 554 N.W.2d 379). Misuse of the influence that accompanies a position may, under certain circumstances, result in application of the culpability exception. *Id.*

Two Michigan cases address the culpability exception in the context of a malpractice case premised upon an adulterous relationship between a physician and patient. In *Rosenick,* the Court of Appeals reversed the trial court's finding of summary disposition based on the wrongful conduct rule and applied the culpability exception [11]. In that case, the plaintiff sought psychiatric counseling for marital problems from the defendant and a sexual relationship ensued. Plaintiff filed a med-

---

**10.** In dicta, the Michigan Court of Appeals observed that the causal connection requirement "arguably has not been met" in *Rosenick v. Cham,* 2001 WL 776737 (Mich.App. January 16, 2001). In *Rosenick,* the Plaintiff had an adulterous relationship with her psychiatrist and sued her psychiatrist for medical malpractice. However, the medical malpractice claim was based not only on the sexual relationship, but also on several other misconduct allegations, including: (1) the defendant counseled plaintiff's husband to withhold financial support from the plaintiff, (2) defendant gave plaintiff money to fund her living expenses, (3) defendant loaned plaintiff a vehicle, (4) defendant paid for plaintiff's legal fees for her divorce, and (5) defendant gave plaintiff drugs for which he did not write a prescription or keep records. Under these circumstances, the Court indicated that plaintiff's damages were arguably proximately caused, not by the adulterous relationship, but by the defendant's medical malpractice.

This case can be distinguished because Plaintiff's medical malpractice claim was based solely on the adulterous relationship between Plaintiff and Dr. Peters. Moreover, the part of the *Rosenick* opinion that addressed a causal connection is dicta, and, therefore, holds no precedential value for this Court.

**11.** Similarly, the Michigan Court of Appeals applied the culpability exception in *Stopera, supra.* In that case, the plaintiff and defendant engaged in a sexual relationship, but the defendant withheld knowledge that he had a sexually transmittable disease. In holding the culpability exception applied, the Court noted, "[i]t is one thing to engage in illegal adultery, as both plaintiff and defendant did, but quite another to do so knowing that a likely result will be infecting a sexual partner with a serious disease while not making that fact known, an offense of which only the defendant is guilty." *Stopera,* 218 Mich.App. at 570–71, 554 N.W.2d 379. The Court found the defendant was significantly more culpable because the blame for plaintiff's contracting the disease rested largely with the defendant. *Id.*

ical malpractice claim against the physician-defendant based on the adulterous relationship, as well as several other misconduct allegations, including: (1) the defendant counseled plaintiff's husband to withhold financial support from the plaintiff, (2) defendant gave plaintiff money to fund her living expenses, (3) defendant loaned plaintiff a vehicle, (4) defendant paid for plaintiff's legal fees for her divorce, and (5) defendant gave plaintiff drugs for which he did not write a prescription or keep records. The Court held that the defendant's culpability was greater because the adulterous relationship occurred "within the context of the physician-patient relationship". Additionally, the Court found other cases applying the wrongful conduct rule distinguishable because, in *Rosenick,* the plaintiff "alleged wrongdoing by the defendant beyond adultery" such that the plaintiff's damages stemmed from the "defendant's alleged acts of medical malpractice, not solely from her adulterous conduct." *Id.* at 4.

A year later, the Court revisited the applicability of the culpability exception in *Correll,* 2002 WL 226935 (Mich.App. February 8, 2002). In *Correll,* the plaintiff filed a medical malpractice claim against his alcohol addiction treatment provider because the counselor-patient relationship evolved into an adulterous sexual relationship. The Court upheld summary disposition based on the wrongful conduct rule and concluded that the culpability exception was inapplicable. In doing so, the Court observed that the plaintiff did not allege in the complaint, and the record did not support, that the defendant "used her position as plaintiff's treatment provider to exert any undue influence or otherwise coerce him into engaging in an adulterous sexual relationship." *Id.* at 2. Indeed, the plaintiff "voluntarily sought out a personal relationship" with the defendant; "at best,

the record shows the relationship was mutually sought after and nurtured by both." *Id.* The Court concluded, "[w]hatever ethical strictures [the defendant] may have violated by participating in the illicit relationship, absent any allegation or proof on the record that she misused her position in order to achieve that relationship...summary disposition...was appropriate." *Id.* In reaching that conclusion, the Court recognized that as the plaintiff's treatment provider, the defendant was "arguably somewhat more culpable in that, as a professional addiction counselor with more than twenty years' experience, she should have been able to control her behavior. However,...without more, she could not be found to be 'significantly' more culpable[.]" *Id.* at n. 6. Thus, in *Correll,* the Plaintiff clearly and voluntarily sought out a personal relationship with his treater. That is not the case here.

In this case, the record supports a finding that the culpability exception is applicable. Viewed in a light most favorable to the Plaintiff, the evidence demonstrates that Dr. Peters used Plaintiff's therapy sessions to exert undue influence over Plaintiff by using "the opportunities to induce Plaintiff to leave her husband and [to] commence a sexual relationship with her"[12]. At the same time, Dr. Peters was prescribing heavy doses of drugs for Plaintiff.

As noted above, Plaintiff testified that she was ingesting significant quantities of drugs under Dr. Peters' care. Dr. Peters counseled Plaintiff to leave her husband and used a therapy session to humiliate Plaintiff's now ex-husband in Plaintiff's presence. In addition, Donald Clark testified that Plaintiff was "taken by Dr. Peters", looked up to her, and that Dr. Peters gave Plaintiff "all this special attention." Dep. Clark at 47:6–16.

12. Ex. D to Defs'. Supp. Br. at ¶ 9.

Thus, the evidence supports a finding that Dr. Peters "used her position as plaintiff's treatment provider to exert any undue influence or otherwise coerce [her] into engaging in an adulterous sexual relationship." *Correll*, 2002 WL 226935, *2.

Moreover, the evidence indicates the relationship was not initiated or maintained at the same level by both parties. Donald Clark's deposition testimony is illustrative. Plaintiff's now ex-husband testified that "Peters called [Plaintiff] the first time to go out to lunch" and that Dr. Peters "called all the time...daily and at 10:00 at night, 11:00 at night." Dep. Clark at 48:18–20; *Id.* at 43:1–10. Indeed, Dr. Peters was still pursuing Plaintiff in March, 1997, when she called the police when she could not locate Plaintiff one evening.

Based on this evidence, Plaintiff may avail herself of the "culpability exception" to the wrongful conduct rule. The evidence demonstrates that the wrongful conduct rule would not have barred Plaintiff's medical malpractice case and, therefore, summary judgment is inappropriate.

## IV. Statute of Limitations

■ The Defendants final argument in support of summary judgment is that the statute of limitations ("SOL") ran before Defendants were retained by Plaintiff. Initially, Defendants argued that the physician-patient relationship ended, at the latest, in May 1996. Defs.' Mot. at 13. Thus, the two-year SOL ran prior to retaining the Defendants in November 1998. *Id.* at 12–13. Plaintiff responds that because the doctor-patient relationship ended in September 1997, the SOL began to run at that date, such that the Defendants were retained well before the SOL's expiration. Pl.'s Resp. Br. at 9.

On November 6, 2003, the Defendants filed a supplemental brief in which they make the alternative argument that the termination of the doctor-patient relationship is irrelevant to the SOL analysis. Defs.' Supp. Br. at 2. The Defendants assert the SOL begins to run when the act or omission giving rise to the medical malpractice claim occurred. *Id.* According to the Defendants, because the sexual relationship began in March 1996 and Plaintiff divorced her husband in October 1996, the acts that form the basis of Plaintiff's medical malpractice claim occurred prior to November 16, 1996—more than two years before the Defendants were retained by the Plaintiff. *Id.*

Generally, the statute of limitations in a medical malpractice case is two years from the time the claim first accrues. M.C.L. §§ 600.5805(1), (6)[13]. A claim accrues at "the time...the act or omission that is the basis for the claim of medical malpractice" occurs. M.C.L.A. § 600.5838a(1). The Michigan Court of Appeals observed,

> This unambiguous language reflects the Legislature's desire to focus the accrual date of medical malpractice claims on the occasion of the act or omission complained of, and the Legislature's clear rejection [that] a continuing physician-patient relationship by itself could extend the accrual date beyond the specific, allegedly negligent act or omission charged.

*McKiney v. Clauman, MD, DDS*, 237 Mich.App.198, 203 (1999).

In order to survive summary judgment, Plaintiff's claim must have accrued prior to November 16, 1996—two years prior to her retention of the Defendants. The essence of Plaintiff's medical malpractice claim was that the sexual relationship with

**13.** M.C.L.A. §§ 600.5838a(1) and (2) provide an alternative limitations period of six months after the time the plaintiff should have discov-ered the potential claim. Here, the parties only cite the two-year statute of limitations found in M.C.L.A. § 600.5805(6).

her former psychiatrist led to the destruction of Plaintiff's marriage and the deterioration of Plaintiff's mental health. Ex. D to Defs'. Supp. Br. Plaintiff's medical malpractice complaint offered no specific dates regarding when the sexual encounters occurred, but generally alleged the sexual relationship led to Plaintiff's damages. *Id.*

The Defendants' position is that Plaintiff's cause of action accrued as of the first sexual encounter in March 1996, or at the latest, in October 1996 when Plaintiff's divorce became final. The Defendants argue that any subsequent instances of sexual conduct are irrelevant because Michigan does not recognize a "continuing wrong" or "continuing treatment" rule that would extend the statute of limitations[14]. Insofar as Plaintiff's medical malpractice action was based upon a causal connection between the doctor-patient sexual relationship and the deterioration of Plaintiff's marriage, the Defendant is correct. Even viewing the evidence in a light most favorable to the Plaintiff, these acts occurred more than two years prior to the Defendants' retention and cannot be extended under a "continuing treatment" theory.

However, to the extent Plaintiff's medical malpractice claim is based on a physician taking advantage of her patient over a prolonged period of time, Plaintiff's medical malpractice claim accrued at the termination Plaintiff's therapy. Evidence in the record supports Plaintiff's position that the doctor-patient relationship lasted until March 1997, and possibly September 1997. See Ex. 12 to Pl.'s Resp. (Pontiac, Michigan police report, March 9, 1997, filed by Dr. Peters when she was unable to locate Plaintiff one afternoon. Dr. Peters alleged

that Plaintiff was her patient, and she was unable to contact her for the past 24 hours due to surgery.) Ex. 11 to Pl.'s Resp. (Affidavit of Plaintiff stating that Dr. Peters treated her until September 1997). Accepting this evidence as true for purposes of summary judgment, Defendant McCann was hired well within the two-year statute of limitations period.

Viewing the evidence in a light most favorable to the Plaintiff, Plaintiff's medical malpractice claim accrued as late as March or September 1997. Thus, the Defendants were retained, and Plaintiff's claim was filed, within the two-year statute of limitations on November 16, 1998 and July 15, 1999, respectively. Summary judgment is not appropriate under these circumstances.

### SUMMARY

For the reasons stated, the Court DENIES the Defendants' motion for summary judgment.

SO ORDERED.

---

14. The "continuing wrong" or "continuing treatment" theory holds that a defendant's continuous tortious conduct tolls the statute of limitations until the patient's treatment is terminated or the wrong is abated. *See, e.g., Desano v. Repitor,* 1998 WL 1991022, *1 (Mich.App. July 10, 1998); *Jacobs v. Singh,* 2002 WL 27821, *3 (Tenn.App. January 11, 2002). The Defendants correctly assert that Michigan does not recognize a "continuing wrong" or "continuing treatment" theory of accrual in medical malpractice actions. *McKiney,* 237 Mich.App. at 208.