# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-CA-00021-COA

**JEFF CAHN, LAURIE CAHN, AND DAVID CAHN, INDIVIDUALLY, AND ON BEHALF OF ALL WRONGFUL DEATH BENEFICIARIES OF BEN CAHN, DECEASED**                                  APPELLANTS

v.

**COPAC, INC., D/B/A COPAC ADDICTION SERVICES, DR. LLOYD GORDON, M.D., BRIDGET RULE, LPN, AND REBECCA OSBORNE, LPN**                                  APPELLEES

| | |
|---|---|
| DATE OF JUDGMENT: | 12/17/2013 |
| TRIAL JUDGE: | HON. JOHN HUEY EMFINGER |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | SHANE F. LANGSTON |
| | REBECCA M. LANGSTON |
| | JOHN BRECKENRIDGE HUNT IV |
| ATTORNEYS FOR APPELLEES: | JAMES LEROY BANKS IV |
| | STUART BRAGG HARMON |
| | WADE G. MANOR |
| | ANDREW JAMES STUBBS |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| TRIAL COURT DISPOSITION: | SUMMARY JUDGMENT GRANTED IN FAVOR OF APPELLEES |
| DISPOSITION: | REVERSED AND REMANDED: 12/08/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE GRIFFIS, P.J., CARLTON AND WILSON, JJ.**

**GRIFFIS, P.J., FOR THE COURT:**

¶1.    This appeal arises from a medical-malpractice wrongful-death claim.  The circuit court granted a summary judgment based on the "wrongful conduct" rule.  The Appellants argue that the court erred in the application of the "wrongful conduct" rule and erred in the

consideration of hearsay statements to decide the summary judgment. We find reversible error and remand for further proceedings.

FACTS

¶2. Defendant COPAC, Inc., doing business as COPAC Addiction Services ("COPAC"), operates a residential drug and alcohol treatment facility in Flowood, Mississippi. The facility is licensed and regulated by the State of Mississippi and listed by the Department of Health as a facility authorized to render such services. Defendant Lloyd Gordon, M.D., is the chief medical director and owner of COPAC. Defendants Bridget Rule, LPN, and Rebecca Osborne, LPN, are nurses at the COPAC facility and were the medical staff present at the times relevant to the claims presented.

¶3. On October 7, 2011, Ben Cahn was admitted to COPAC for treatment. The primary purpose for his treatment and inpatient admission was drug and alcohol addiction with a "predisposition for the abuse of prescription medications." Dr. Gordon was Ben's treating physician and was responsible for his care at COPAC.

¶4. Ben's stay at COPAC was relatively unremarkable until the weekend of December 14, 2011. On December 14, Nurse Rule noted that Ben was expressing great anxiety regarding his "family." Also, she noted that he became defiant with the staff while taking his "lunch meds." And in the presence of COPAC staff, Ben swallowed many more of his Neurontin medication than his prescription allowed.

¶5. After learning of this, Jeff and Laurie Cahn, Ben's parents, traveled from their home in Minnesota to COPAC to visit Ben and speak with his caregivers. On Friday, December

2

16, 2011, the Cahns took Ben to dinner and then returned Ben to COPAC. Ben refused to get out of their vehicle and insisted on leaving COPAC. The COPAC counselor on duty intervened, and Ben agreed to be transferred from his room to the infirmary, so that he could be monitored more closely. Ben was to remain at COPAC until Monday, when his parents would provide his counselor with a list of alternative treatment facilities for a possible transfer. On December 16, Ben apologized to the counselor and told her to relay a message to his parents that he would agree to remain at COPAC until January 4, 2012.

¶6. On Saturday, December 17, 2011, Ben was housed in the infirmary. Dr. Gordon began the day rushing into his office, which was located in the same building and directly across the hall from the infirmary. He was there to get some cheese and turn on his computer. He got the cheese quickly, turned on his computer, "thought" he locked his office door, and left.

¶7. Another patient, identified as "C.T.," was also housed in the infirmary on December 17. As part of this appeal, the Cahns have contested the fact that COPAC offered C.T.'s testimony through Dr. Gordon and others, but COPAC has refused to produce C.T.'s records and the "statements" they took from C.T. after Ben's incident. C.T. was transferred to the infirmary due to some behavioral problems. This same weekend, C.T. had stolen some beer from a convenience store off-site, and COPAC placed C.T. back into the infirmary.

¶8. After Ben's death, COPAC's director of operations Tom Kepner interviewed C.T. Kepner testified that C.T. said that on the weekend evenings, December 16-17, he and Ben were "running up and down" the halls outside of the infirmary trying to access the offices,

3

and the COPAC nurses "had been trying to chase them back" into their room. C.T. said that they finally broke into Dr. Gordon's office because they "thought it would be the most likely place for there to be something."[1]

¶9. On the morning of Sunday, December 18, 2011, Nurse Rule attempted to awaken Ben. She reported that Ben was "very hard to arouse for medications." She finally got him to take his medications and "he went right back to sleep." At noon, Ben was still asleep. Nurse Rule "attempted to arouse [him] again with difficulty." She became alarmed and suspicious. She called the "CAs" to assist her – to get Ben in his scrubs, search his clothing, and conduct a UDS (i.e., urine drug screening).

¶10. From noon until 3:00 p.m., Nurse Rule noted that Ben "complained that he could not urinate" for the UDS. Around 3:15 p.m., she reported that she observed another patient exit the restroom and hand Ben his urine specimen, who in turn presented it to Nurse Rule as his UDS. Nurse Rule confronted Ben and he denied using "substances." Ben, however, continued to complain that he could not urinate. This continued for a several more hours until just prior to the 5:30 p.m. shift change, when Nurse Rule documented that she finally observed Ben give a urine specimen. She then reported that the "10 line drug panel" test performed on Ben's urine "showed [p]ositive BZOs," which can indicate the presence of Valium, Librium, Xanax, and/or other tranquilizers.

---

[1] Kepner acknowledged that incidents such as this should have been documented and reported by the nursing staff who made such observations. There was no documentation by the nurses. Kepner testified that he was "disappointed" that this did not happen. He was also "disappointed in himself" because, despite Ben's death and the lawsuit, he had not interviewed any members of COPAC's staff to determine who should have documented and reported these events and why they failed to do so.

4

¶11. Nurse Rule also documented that she had asked two CAs to search Ben's "clothing." But there was no documentation that anyone searched the infirmary room where Ben and C.T. were staying.[2] The notes indicate that only Ben's clothing was searched. Even after Ben's positive drug screen, COPAC did not search his room. COPAC also failed to document the next search, after Ben's death, when it claimed to have found the Suboxone under Ben's mattress.

¶12. COPAC tested two of Ben's urine specimens. The first was collected at 4:31 p.m., but it was not tested by the lab until 6:40 p.m. It tested positive for buprenorphine/Suboxone. A second specimen was collected at 5:31 p.m., and at 5:47 p.m.; it tested positive for buprenorphine/Suboxone.

¶13. Nurse Osborne took over the care of Ben around 5:30 p.m. There was no medical record or "Progress Note" that indicated that she or anyone else was caring for Ben. Nevertheless, the Cahns claim that, as early as 5:47 p.m. and no later than at 6:40 p.m., COPAC was aware that Ben had ingested Suboxone. Ben did not have a prescription for Suboxone, and he was not authorized to have it or to ingest it.

¶14. Around 9:45 or 10:00 p.m., COPAC's staff was told by C.T. that Ben was not breathing. They checked on Ben and noted that "[his face was] bluish, black, there was no heartbeat and there were copious amounts of bloody looking secretions pouring from mouth and nose. Bed noted to be soaked from bodily fluids." Ben could not be resuscitated and was pronounced dead at 10:45 p.m.

---

[2] The Cahns claim this was a violation of COPAC's "Search and Seizure" policy.

PROCEDURAL HISTORY

¶15.   On September 19, 2012, Jeff and Laurie Cahn, along with David Cahn (Ben's brother), individually and on behalf of Ben's wrongful-death beneficiaries, filed a complaint in the Circuit Court of Rankin County. The complaint was amended. The named defendants included COPAC, Inc., Dr. Lloyd Gordon, Bridgett Rule, and Rebecca Osborne.

¶16.   On September 20, 2013, Dr. Gordon filed a motion for summary judgment, joined by the other defendants. The Cahns filed a response, and they had also filed motions to compel discovery. The circuit court granted the motion for summary judgment and ruled:

> In the instant case, the Defendants moved for summary judgment and argued that, pursuant to *Price v. Purdue Pharma Company*, 920 So. 2d 479 (Miss. 2006), the Plaintiffs were barred from any recovery in this case because the deceased, Ben Cahn, illegally obtained, illegally possessed and/or illegally ingested buprenorphine/[S]uboxone, a controlled substance, which was the cause of his death. The Defendants supported their motion with sufficient "summary judgment" proof to shift the burden to the Plaintiffs.
>
> The Plaintiffs failed to produce sufficient "summary judgment" proof to show that there is a genuine issue as to any material fact which would require a trial in this matter. There is no proof that the deceased legally obtained and/or ingested the buprenorphine/[S]uboxone, which ultimately caused his death. Instead, Plaintiffs argued that a cause of action would still exist against the Defendants for their negligence once they discovered that the deceased had the buprenorphine/[S]uboxone in his system. The Court finds however, pursuant to *Price*, that is not the case.

It is from this judgment that the Cahns now appeal.

ANALYSIS

I.      *Whether it was error to grant summary judgment based on the "wrongful conduct" rule.*

        A.      *Standard of Review*

6

¶17. This Court's review of the grant of summary judgment is de novo. *Price*, 920 So. 2d at 483 (¶10). In *Price*, the court also further defined the standard of review as follows:

> In considering this issue, we must examine all the evidentiary matters before us, including admissions in pleadings, answers to interrogatories, depositions, and affidavits. The evidence must be viewed in the light most favorable to the party against whom the motion has been made. Issues of fact sufficient to require a denial of a motion for summary judgment are obviously present where one party swears to one version of the matter in issue and another party takes the opposite position. If no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment should be entered in that party's favor. The movant carries the burden of demonstrating that no genuine issue of material fact exists, and the non-moving party is given the benefit of the doubt as to the existence of a material fact issue. However, our decisions which discuss this rule are clear that when a motion for summary judgment is made and supported as provided in [Mississippi Rule of Civil Procedure] 56, an adverse party may not rest upon the mere allegations or denials of the pleadings, but instead the response must set forth specific facts showing that there is a genuine issue for trial. If any triable issues of fact exist, the trial court's decision to grant summary judgment will be reversed. Otherwise, the decision is affirmed.

*Id.* at 483-84 (¶10) (internal citations omitted).

### B. The Cahns' Claims

¶18. The Cahns have asserted claims for negligence and/or gross negligence and wrongful death. The negligence claim is often referred to as a medical-malpractice claim. A medical-malpractice claim requires that the plaintiffs prove there was "a duty by the defendant to conform to a specific standard of conduct for the protection of others against an unreasonable risk of injury; a failure to conform to the required standard; and an injury to the plaintiff proximately caused by the breach of such duty by the defendant." *Hubbard v. Wansley*, 954 So. 2d 951, 956-57 (¶12) (Miss. 2007). The plaintiffs allege that the defendants owed Ben Cahn a duty to exercise that standard of care required of minimally qualified providers of

7

drug and alcohol inpatient rehabilitation services, the defendants breached this duty, and the breach proximately caused or contributed to the death and damages of Ben Cahn.

### C.     The Motion for Summary Judgment

¶19.    Dr. Gordon's motion for summary judgment was joined by the other defendants.  At the hearing, Dr. Gordon's counsel argued:

> For a hundred years the undisturbed law in Mississippi has said, "If a plaintiff cannot open his case without showing that he has broken the law, a court will not aid him."  That law has never changed in Mississippi.  It's still the law today.  It's the backbone of this entire case.
>
> There's been a lot of talk by counsel opposite both in their brief and in their argument today of whether or not Dr. Gordon or whether or not COPAC was . . . negligent.
>
> Your Honor, I'll stand before you as an officer of the court and say if we were merely here arguing [Dr. Gordon] was . . . negligent, and this was about which of the two parties [(Dr. Gordon or COPAC)] was more . . . negligent:
>
> (1)     You wouldn't see me file such a motion, but;
>
> (2)     I can say to you right now that's [(i.e., the negligence of Dr. Gordon and COPAC)] an issue of fact.  That's a battle of experts.
>
> We're not here arguing about . . . negligence.

The summary judgment did not consider the merits of the Cahns' medical-malpractice claims.  It was limited to whether the "wrongful conduct" rule barred the Cahns' claims.  The circuit court ruled that "Ben Cahn[] illegally obtained, illegally possessed and/or illegally ingested buprenorphine/[S]uboxone, a controlled substance, which was the cause of his death."  As a result of Ben's illegal activity, the court barred his wrongful-death beneficiaries' claim for negligence and granted summary judgment.  We review the motion

8

de novo.

¶20.    We begin our review with the question of whether there is a genuine issue of a material fact in dispute.  We compare the defendants' itemization of undisputed facts to the Cahns' response (in brackets and italics):

a.      Ben Cahn, a 24-year-old with a history of alcohol and substance abuse, was voluntarily admitted into the COPAC alcohol treatment program on October 6, 2011. *[Admitted.]*

b.      He was admitted on transfer from Hazelden, another treatment facility where he had been treated for alcohol and multi-substance abuse. *[Admitted.]*

c.      Over the next couple of months, [Ben] continued in the treatment program at COPAC.  *[Admitted.]*

d.      Sometime during the night of December 17, 2011, Ben and his roommate, C.T., broke into Dr. Gordon's office and stole Suboxone and multiple prescription pads. *[Denied as to the contention that Ben Cahn broke into Dr. Gordon's office, as the question of Ben Cahn's involvement in the entry to Dr. Gordon's office is an unresolved issue of material fact.]*

e.      Suboxone, also referred to as buprenorphine, is a Schedule III Narcotic under the Uniformed Controlled Substances Law.  *[Admitted.]*

f.      Ben Cahn was never prescribed Suboxone while at COPAC. *[Admitted.]*

g.      Sometime after stealing and taking possession of the Suboxone, Ben ingested an unknown quantity of the narcotic drug. *[Denied as to the contention that Ben Cahn stole and took possession of the Suboxone, as this is an unresolved issue of material fact; admitted that Ben Cahn ingested an unknown quantity of Suboxone.]*

h.      A urine drug screen taken at COPAC around 5:30 p.m. on the 18th confirmed the presence of Suboxone in Ben's system.  *[Admitted.]*

i.      Later that evening, Ben was noted to be in the infirmary hallway in

9

scrubs; alert and oriented; and then in the kitchen eating around 8:00 p.m. *[Admitted to the extent that the relevant non-contemporaneous note recorded by Rebecca Osborne in Ben Cahn's medical records state[s] such an observation.]*

j.      At 8:15 p.m. Ben was noted as asleep and snoring in his infirmary room. *[Admitted to the extent that the relevant non-contemporaneous note recorded by Rebecca Osborne in Ben Cahn's medical records state[s] such an observation.]*

k.      At around 9:45 p.m., C.T. informed the clinical assistant at COPAC that Ben was not breathing and had turned blue. *[Admitted to the extent that the relevant non-contemporaneous note recorded by Rebecca Osborne in Ben Cahn's medical records state[s] such an observation.]*

l.      Resuscitative efforts were begun immediately and 911 was called. *[Admitted to the extent that the relevant non-contemporaneous note recorded by Rebecca Osborne in Ben Cahn's medical records state[s] such an observation.]*

m.      Despite nearly an hour of resuscitative efforts, Ben Cahn was pronounced dead at approximately 10:45 p.m. on December 18, 2011. *[Admitted to the extent that the relevant non-contemporaneous note recorded by Rebecca Osborne in Ben Cahn's medical records state[s] such an observation.]*

n.      The Amended Autopsy Report showed a toxic level of buprenorphine in Ben Cahn's post-mortem blood and listed the cause of death as buprenorphine toxicity. *[Admitted.]*

¶21.   The defendants' motion argues that there were two types of "wrongful conduct" by Ben. First, they claim that Ben committed three separate criminal acts (two acts of larceny and one act of burglary) when he broke into Dr. Gordon's office. The Cahns dispute this factual allegation, and they challenge the admissibility of this evidence that supports the "break in." Second, the defendants contend that Ben committed a crime by the mere possession of a controlled substance when he ingested Suboxone. Ben violated Mississippi

10

Code Annotated section 41-29-139(c) (Supp. 2015) by the possession of a controlled substance without a valid prescription or physician's order.

### D. The "Wrongful Conduct" Rule

¶22. In *Price v. Purdue Pharma Company*, 920 So. 2d 479 (Miss. 2006), Ernest Price alleged that he was injured by ingesting OxyContin and that he was addicted to the drug. *Id.* at 481 (¶1). His complaint named several defendants, including physicians, pharmacies, and pharmaceutical companies. *Id.* at 481-82 (¶3). Price asserted claims for negligence, products liability, malicious conduct, fraud, and malpractice. *Id.* at 482 (¶3). Price argued that OxyContin was addictive, that the addictive nature of the drug caused him injury, and that the defendants were liable to him because they prescribed, distributed, and manufactured the drug. *Id.* The physicians named as defendants had provided Price medical treatment, and he used several physicians and pharmacies to obtain the drug. *Id.* at (¶4).

¶23. The defendants asserted the "wrongful conduct" rule in a motion for summary judgment. The trial court granted summary judgment and the supreme court affirmed. The court ruled:

> This Court has long recognized the maxim, from the words of Lord Mansfield, in *Holman v. Johnson*, 1 Cowper. 341, decided in 1775, "ex dolo malo non oritur actio," which means that "[n]o Court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act." *Morrissey v. Bologna*, 240 Miss. 284, 300-01, 123 So. 2d 537, 545 (1960). Nearly a century ago, this Court laid out the rule in Mississippi.
>
> > If a plaintiff cannot open his case without showing that he has broken the law, a court will not aid him. It has been said that the objection may often sound very ill in the mouth of the defendant, but it is not for his sake the objection is allowed; it is founded on general principles of policy which he shall have the

11

advantage of, contrary to the real justice between the parties. The principle of public policy is that no court will lend its aid to a party who grounds his action upon an immoral or illegal act.

The principle has been applied in numerous cases wherein its application seems to have been of doubtful propriety, but the principle as stated is undoubtedly sound in logic, and necessarily affords the true test for the guidance of the courts.

*Western Union Telegraph Co. v. McLaurin*, 108 Miss. 273, 66 So. 739, 740 (1914). This rule in Mississippi applies to contracts cases as well, preventing relief on a claim based on a contract that is illegal or against our state's public policy. *Lowenburg v. Klein*, 125 Miss. 284, 87 So. 653, 655 (1921). This Court reemphasized the *Western Union* rule later in another case by holding that a plaintiff may be barred from any right of action when the incident giving rise to the claim was rooted in the plaintiff's violation of law. [*Downing v. City of Jackson*, 199 Miss. 464, 477, 24 So. 2d 661, 664 (1946).]

At the same time, if the plaintiff is a lawbreaker at the time of his injury, that alone is not enough to bar the plaintiff from recovery. *Meador v. Hotel Grover*, 193 Miss. 392, 9 So. 2d 782, 786 (1942). This principle is consistent with tort law concerning duties owed to known trespassers and preventing use of spring guns from guarding property. The injury must be a proximate result of committing the illegal act. *Id.* at 785. "The injury must be traceable to his own breach of the law and such breach must be an integral and essential part of his case. Where the violation of law is merely a condition and a not a contributing cause of the injury, a recovery may be permitted." *Id.* The question is not merely when the wrongdoing was done, but what resulted from it. This Court has long held that if a plaintiff actually requires essential aid from his own illegal act to establish a claim, he has no case. *Capps v. Postal Telegraph–Cable Co.*, 197 Miss. 118, 19 So. 2d 491, 492 (1944).

*Price*, 920 So. 2d at 484-85 (¶¶13-14).

¶24. The court concluded that "Price's entire claim is wholly rooted in his own transgressions taking place at the time his alleged injury occurred." *Id.* at 485 (¶15). "However, Price's wrongdoing coincides with his claim on a level beyond the mere question of when it took place." *Id.* Then, the court held:

12

> Price absolutely requires the essential aid from his own misdeeds to establish his claim. His violation of the law is not merely a condition, but instead an integral and essential part of his case and the contributing cause of his alleged injury. Additionally, we cannot find that two versions of the matter at hand exist. Price never responded at trial, nor does he now, to the assertions that he was concurrently utilizing ten doctors and ten clinics in two cities and seven pharmacies in three cities to obtain OxyContin.

*Id.* at (¶14). The court then summarized its holding:

> Before today, we have not been confronted with a case factually similar to today's case, where a claimant's case is based in his attempt to obtain a controlled substance through his own malfeasance. This Court's previous cases, which we have discussed, are factually dissimilar from today's case. . . . We now join those jurisdictions in holding that "the wrongful conduct rule" in Mississippi prevents a plaintiff from suing caregivers, pharmacies, and pharmaceutical companies and laboratories for addiction to a controlled substance which he obtained through his own fraud, deception, and subterfuge. This Court will not lend aid to a party whose cause of action directly results from an immoral or an illegal act committed by that party.

*Id.* at 486 (¶17).

¶25. The Mississippi Supreme Court first discussed the "wrongful conduct" rule in 1914, in *Western Union Telegraph Co. v. McLaurin*, 108 Miss. 273, 66 So. 739, 740 (1914). The plaintiff sued Western Union when his relationship with a prostitute was revealed to his mother and the community-at-large by the incorrect delivery of two telegrams. *Id.* at 739-40. The court held that "[i]f a plaintiff cannot open his case without showing that he has broken the law, a court will not aid him." *Id.* at 740. The court recognized that the telegraph company "violate[d] its public duties." *Id.* at 741. Despite this violation, the court barred the plaintiff from recovery because "when it appears [the] plaintiff's right to recovery is based upon his own wrongs, the courts will bring his case to an end and disregard the wrongs of the defendant." *Id.*

13

¶26.    The court also acknowledged the difficulty of the rule's application.

> It has been said that the objection may often sound very ill in the mouth of the defendant, but it is not for his sake the objection is allowed; it is founded on general principles of policy which he shall have the advantage of, contrary to the real justice between the parties.

*Id.* at 740.  The court determined that the principle of public policy "that no court will lend its aid to a party who grounds his action upon an immoral or illegal act" would override any difficult application of this rule.  *Price*, 920 So. 2d at 484 (¶13).

¶27.    Next, in *Illinois Central Railroad Co. v. Messina*, 111 Miss. 884, 72 So. 779, 780 (1916), the court determined that the "wrongful conduct" rule did not bar recovery where a man was injured in a train wreck, even though he was present on the train illegally.  The court found that the "plaintiff's injuries were not caused or increased by the violation of the law." *Id.*  The court distinguished *Western Union* and found that, in *Western Union*, "[i]t was absolutely necessary for the plaintiff to disclose his own wrong in order to make out his case." *Id.*  There, the plaintiff could not prove damages without revealing his immoral and illegal conduct, as the injuries were "self-inflicted." *Id.*  But the court found that the plaintiff in *Messina*, who was injured in the train wreck, could show all of the essential elements of his case without disclosing his illegal conduct because "the violation of the law did not cause or contribute to the damages." *Id.*  Thus, the "wrongful conduct" rule did not bar the plaintiff's recovery.

¶28.    In *Whitley v. Holmes*, 164 Miss. 423, 144 So. 48 (1932), the court did not bar a man from recovery when he was injured in a car wreck while participating in secular work on a Sunday.  The defendant argued that the man could not recover because he was violating the

14

statute prohibiting secular work on Sunday when his injury occurred. *Id.* at 49. The court

disagreed, finding "no causal connection between such violation and the negligence" of the

defendant. *Id.* The court went on to say that

> [a] party to an action, when called upon to answer for the consequences of his own wrongful or negligent act, cannot rely in defense on the separate or distinct wrongful act of the other, done not to himself nor to his injury, and not connected with, or causing, or contributing to, the negligence complained of; but the wrongful or illegal act or conduct of the plaintiff which will preclude the recovery for the injury complained of must have some causal connection with the injury.

*Id.*

¶29. Then, in *Meador v. Hotel Grover*, 193 Miss. 392, 9 So. 2d 782, 786 (1942), the court

held that the "wrongful conduct" rule did not bar a plaintiff from recovery when he received

his injuries as a result of an elevator accident that occurred as he was going to a prostitute's

hotel room. The court ruled that, for a plaintiff to be barred by the rule, the plaintiff's "injury

must have been suffered while and as a proximate result of committing an illegal act." *Id.*

at 785. The court reasoned:

> The unlawful act must be at once the source of both his criminal responsibility and his civil right. The injury must be an integral and essential part of his case. Where the violation of law is merely a condition and not a contributing cause of the injury, a recovery may be permitted.

> The mere status of a plaintiff as a lawbreaker at the time of his injury is not sufficient of itself to bar him from resort to the courts. With respect to the particular act out of which the injury arose, his right to invoke the power of the law to protect can be neutralized only by the power of the law to punish.

*Id.* at 785-86. Under these facts, the court found "[t]he status of the deceased as a violator

of the law" an irrelevant inquiry. *Id.* at 786. The court found that the "wrongful conduct"

15

rule did not bar the plaintiff's recovery.

¶30.    In *Downing v. City of Jackson*, 199 Miss. 464, 24 So. 2d 661, 664 (1946), the court held that the "wrongful conduct" rule barred recovery when a wife sued her husband's employer after he died from injuries sustained during a wreck. Her husband was operating a truck and trailer for a short distance in the course of his employment, and the trailer did not have operating brakes, in violation of state statute. *Id.* The court held that the "wrongful conduct" rule would bar the wife from recovery against the employer because her husband was violating the law "in the doing of the things which caused the accident." *Id.*

¶31.    Until *Price*, the supreme court did not consider the "wrongful conduct" rule in a reported decision for almost sixty years. The Cahns urge this Court to abrogate the "wrongful conduct" rule based on Mississippi's comparative-negligence statute, Mississippi Code Annotated section 11-7-15 (Rev. 2004). We have found no Mississippi case that considers both the "wrongful conduct" rule and the comparative-negligence statute. However, we do find other informative authorities on this subject.

¶32.    A leading treatise on torts, *Prosser and Keeton on The Law of Torts* § 36 (5th ed. 1984), states:

> Where it is plaintiff himself who violates the statute, a slightly different problem is presented. In early cases, a few courts, influenced by the idea that no person should be permitted to base a cause of action on his own illegal conduct, held that a plaintiff who was violating a criminal law, by driving on Sunday, could not recover for any injury that the driver might sustain while so engaged. . . . But with few exceptions, the courts have long since discarded the doctrine that any violator of a statute is an outlaw with no rights against anyone, and have recognized that, except in so far as the violator must resort to an illegal contract or an illegal status as the basis of the defendant's duty to him, one who violates a criminal statue is not deprived of all protections

16

against the torts of others.

> The accepted rule now is that a breach of statute by the plaintiff is to stand on the same footing as a violation by the defendant . . . .

¶33. West Virginia has rejected the "wrongful conduct" rule. In *Tug Valley Pharmacy, LLC v. All Plaintiffs Below in Mingo County*, 773 S.E.2d 627, 631-32 (W. Va. 2015), the court held:

> Courts adopting the wrongful conduct rule have engaged in wide-ranging attempts to curb potential abuse or misapplication of the rule by requiring a high degree of causality between the wrongful conduct and the plaintiff's injury. In *Price v. Purdue Pharma Co.*, 920 So. 2d 479, 485 (Miss. 2006), the court attempted to articulate the required nexus by stating that "[w]here the violation of law is merely a condition and not a contributing cause of the injury, a recovery may be permitted." (quoting *Meador v. Hotel Grover*, 193 Miss. 392, 9 So. 2d 782, 786 (1942) (emphasis added)). The *Price* court echoed the common, but hollow, sentiment that [a] plaintiff's claim is barred only if he "actually requires essential aid from his own illegal act to establish a claim[.]" *Id.* The scope and particulars of "essential aid" were not further enunciated.

Further, the court ruled:

> [A] plaintiff's immoral or wrongful conduct does not serve as a common law bar to his or her recovery for injuries or damages incurred as a result of the tortious conduct of another. Unless otherwise provided at law, a plaintiff's conduct must be assessed in accordance with our principles of comparative fault.

*Tug Valley*, 773 S.E.2d at 636.

¶34. This Court has considered other cases where, under the comparative-negligence statute, illegal conduct does not bar recovery. *Gen. Motors Co. v. Pegues*, 738 So. 2d 746 (Miss. Ct. App. 1998). In *Pegues*, the plaintiff sued General Motors after a car wreck, claiming that the ball joint in his truck broke, causing the accident. *Id.* at 748 (¶1). General

17

Motors claimed that the ball joint broke after the car accident, and that the car accident was caused by plaintiff's drunk driving. *Id.* This Court upheld the jury verdict in favor of the plaintiff because the jury, as the finder of fact, was in the best position to decide what caused the accident. *Id.* at 757 (¶32). The opinion does not indicate whether the "wrongful conduct" rule was asserted by General Motors.

¶35. We recognize that there is a conflict in reasoning between the "wrongful conduct" rule and the comparative-negligence statute. However, this Court does not have the authority to overrule or ignore supreme court precedent. Instead, we must interpret it even if we find two doctrines that have some legal contradiction. As a result, we conclude that the "wrongful conduct" rule is an exception to the comparative-negligence statute. And we interpret its applicability to the facts here. We would, however, urge the supreme court to consider and resolve this conflict of legal doctrine.

### E.    This Is a Case of First Impression

¶36. We view this as a case of first impression. We have found no cases that are factually similar. There are, however, cases with some similarity that merit discussion.

¶37. Under Mississippi law, a "hospital is under a duty to exercise reasonable care to safeguard the patient from any known or reasonably apprehensible danger from herself and to exercise such reasonable care for her safety as her mental and physical condition, if known, may require." *Miss. Dep't of Mental Health v. Hall*, 936 So. 2d 917, 923 (¶8) (Miss. 2006) (quoting *Mounts v. St. David's Pavilion*, 957 S.W.2d 661, 663 (Tex. Ct. App. 1997)). This duty may require the facility to safeguard even against a foreseeable risk of suicide by

18

inpatients under the facility's care.[3] This is so even though our supreme court has held that suicide is "an unlawful act" under Mississippi law.[4]

¶38. In *Hall*, the court considered whether a state mental institution could be held negligent to a patient who was injured when she fell from a third-story window at the institution. The court held:

> Standard of Care for Patients with Mental Impairments
>
> A state facility providing mental health care is statutorily mandated to provide "proper care and treatment, best adapted, according to contemporary professional standards." Miss. Code Ann. § 41-21-102 (Rev. 2005). Neither the Legislature nor Mississippi courts have defined "contemporary professional standards," but, in dicta, this Court, speaking through the learned Presiding Justice Banks, commented, "[p]ersons deemed incapable of making rational judgments, such that they must be committed, are not to be protected by a lesser standard than reasonable care under the circumstances." *Carrington v. Methodist Med. Ctr., Inc.*, 740 So. 2d 827, 829-30 (Miss. 1999). In Texas, "[a] hospital is under a duty to exercise reasonable care to safeguard the patient from any known or reasonably apprehensible danger from herself and to exercise such reasonable care for her safety as her mental and physical condition, if known, may require." *Mounts v. St. David's Pavilion*, 957 S.W.2d

---

[3] *See Hall*, 936 So. 2d at 923 (¶8) (*Mounts*, *supra*, was a suicide case) & n.6 (citing additional cases involving suicides); *Truddle v. Baptist Mem'l Hosp. DeSoto, Inc.*, 150 So. 3d 692, 697 (¶20) (Miss. 2014) (recognizing that under Mississippi case law a facility may be held liable in negligence for the suicide of a patient in its custody and control); *Miss. State Hosp. v. Wood*, 823 So. 2d 598, 599 (¶9) (Miss. Ct. App. 2002) (affirming judgment against psychiatric hospital on the ground that its negligence proximately caused the inpatient's suicide); *see also Carrington v. Methodist Med. Ctr., Inc.*, 740 So. 2d 827, 830 (¶16) (Miss. 1999) (reversing summary judgment in favor of hospital on negligence claim arising out of patient's suicide).

[4] *See Nicholson ex rel. Gollott v. State*, 672 So. 2d 744, 753 (Miss. 1996) (criminal case recognizing that suicide is a common-law crime and that suicide and its attempt are made a punishable offenses by statute).

661, 663 (Tex. Ct .App. 1997).[5]

> The Texas standard of care for the duty a hospital owes to a patient is similar to what we enunciated in *Carrington*. It is flexible in that the duty owed to patients may increase depending on the physical or mental condition of the patient. It can therefore be applied to different fact situations. We therefore adopt the Texas standard of care.

*Hall*, 936 So. 2d at 922-23 (¶¶8-9).

¶39. The supreme court then addressed the hospital's argument that the patient's injury was unforeseeable because the room that led to the window was "inadvertently" unlocked. *Id.* at 924 (¶16). The nurses also testified that they did not consider the window to be an escape risk and did not think a plaintiff would use the window to escape. The hospital argued that negligence required that the injuries be "reasonably foreseeable." *Id.* (citing *Rein v. Benchmark Constr. Co.*, 865 So. 2d 1134, 1143 (Miss. 2004)). Hall argued that the fact that an injury rarely occurs, or has never happened, is insufficient to protect the actor from a finding of negligence. *Hall*, 936 So. 2d at 924 (¶14) (citing *Gulledge v. Shaw*, 880 So. 2d

---

[5] In the footnote to this quotation, the court offered the following citations:

> *See also Tomfohr v. Mayo Found*., 450 N.W.2d 121, 124 (Minn. 1990) (a hospital voluntarily undertakes the duty to protect the patient from self-inflicted injury, it had assumed a duty to exercise reasonable care to prevent the event[]); *Cowan v. Doering*, 111 N.J. 451, 545 A.2d 159, 162 (1988) (under certain circumstances, a hospital has the duty to exercise reasonable care to prevent patients from engaging in self-damaging conduct); *Kent v. Whitaker*, 58 Wash. 2d 569, 364 P.2d 556, 557 (1961) (where patient with known suicidal tendencies strangled herself with plastic tubing while unattended in locked room concerned "failure of the specific duty of exercising reasonable care to safeguard and protect a patient with known suicidal tendencies from injuring herself").

*Hall*, 936 So. 2d at 923 n.6.

288, 293 (Miss. 2004)).

¶40.    The court concluded that there was sufficient evidence to support the trial court's finding of negligence. *Hall*, 936 So. 2d at 924 (¶15). The trial judge determined that Hall's attempts to escape and her injury were foreseeable. A psychiatrist on staff at the hospital testified "that it is common knowledge that patients will try to climb out windows." A nurse testified "that any rooms where patients could be present without supervision should have security screens on the windows." Hall's treating physician also testified that "mental hospital staff should know that psychiatric patients will attempt to escape." *Id.* The court concluded that the hospital "had a duty to keep unsupervised rooms locked, to place safety screens on windows in unsupervised areas, and to monitor patients' activities." *Id.* at (¶16). Because the hospital breached these duties and the injuries were foreseeable, the court affirmed the trial court's judgment in favor of Hall. *Id.*

¶41.    When we consider how *Price* and *Hall* affect the decision in this case, we recognize that *Hall*, and the cases cited therein, implies that an inpatient's "wrongful conduct" is not a defense to a negligence claim when the defendant facility has a legal duty to safeguard the inpatient from that very conduct. A number of courts in other states have made this point expressly in various contexts.[6] Instead, in such a case, the inpatient's conduct is simply a

---

[6] *See, e.g.*, *Myers v. Cnty. of Lake, Ind.*, 30 F.3d 847, 853 (7th Cir. 1994) ("A duty to prevent someone from acting in a particular way [(i.e., suicide)] logically cannot be defeated by the very action sought to be avoided."); *Cowan v. Doering*, 545 A.2d 159, 167 (N.J. 1988) ("Because this duty of care included the prevention of the kind of self-damaging acts that caused [the] plaintiff's injuries, the plaintiff's actions and capacity were subsumed within the defendants' scope of duty. Thus, the trial court correctly ruled that the defense of contributory negligence was not available."); *Hoeffner v. The Citadel*, 429 S.E.2d 190, 193 (S.C. 1993) ("[W]here a duty exists to prevent a patient from committing suicide, the

21

"known or reasonably apprehensible danger" of his "mental and physical condition," which the facility has a duty to exercise reasonable care to safeguard against. *Hall*, 936 So. 2d at 923 (¶8).

¶42.    We turn to the consideration of this case.

### 1.    Ben Was Involved in an Illegal Activity

¶43.    The Cahns argue that there was a genuine issue of a material fact in dispute as to how Ben obtained the Suboxone. However, they do not dispute that Ben had Suboxone in his system at the time of death and that he did not have the legal right to this controlled substance. Thus, we find that there is no genuine issue of material fact that Ben violated the law through the possession of Suboxone without a prescription.

¶44.    We consider whether the "wrongful conduct" rule bars the Cahns' claims based on Ben's apparent criminal activity in the possession of a controlled substance and whether the proof was sufficient to grant summary judgment. The defendants argue that the "wrongful conduct" rule looks only at Ben's illegal actions.

¶45.    The Cahns argue that the defendants' "negligent or criminal acts" must also be considered. The Cahns identify three separate negligent or criminal acts by the defendants.

¶46.    First, the Cahns argue that COPAC, as a medical facility that houses, monitors, treats, and secures drug addicts, voluntarily assumed a number of duties relative to Ben Cahn who, as COPAC knew, had a propensity for prescription-drug abuse.

¶47.    Second, the Cahns argue that COPAC and Dr. Gordon illegally possessed and stored

very suicide which the defendant has the duty to prevent cannot constitute assumption of the risk or contributory negligence as a matter of law.").

22

the Suboxone, which Ben ingested and which caused his death. The Cahns claimed that Dr. Gordon criminally and negligently possessed the drug; criminally and negligently stored it in the unlocked drawer of his desk in his office across the hall from the infirmary where Ben was housed; and, on the day prior to the fatal ingestion by Ben, Dr. Gordon likely forgot to engage the deadbolt to his office when he rushed in on Saturday morning to secure some cheese that needed to be refrigerated.

¶48. Third, the Cahns argue that once COPAC knew that Ben had ingested Suboxone while at the facility, it had a duty or voluntarily assumed a duty to use reasonable care to assess, monitor, and treat Ben. We consider this allegation first.

*2. The Duties Owed by the Defendants*

¶49. COPAC was not obligated to admit or provide medical care and treatment for Ben. COPAC assumed this obligation when it accepted payment and admitted him to the facility. The defendants were well aware that Ben had a propensity for abusing controlled substances. With knowledge of his propensity for illegal conduct, COPAC and the defendants accepted responsibility for the medical care and treatment of Ben and had a duty to safeguard him from controlled substances.

¶50. The defendants' motion for summary judgment does not challenge the Cahns' ability to present a prima facie case as to duty, breach of duty, and proximate cause. So it is not necessary that we closely examine the duties owed or whether there was a breach. Instead, it is important to realize that the standard of care was based on the proper care and treatment of a prescription-drug addict by a drug-treatment facility and its medical staff.

23

### 3. The Care Rendered After the Defendants Were Aware that Ben had Ingested Suboxone

¶51. The Cahns argue that the "wrongful conduct" rule does not apply to their claim that the defendants were negligent, i.e., committed medical malpractice, in their care and treatment of Ben *after* they learned that he had ingested Suboxone. It was certainly foreseeable for a drug-treatment facility to expect its residents, who are there for their addiction to controlled substances, will attempt to secure controlled substances for their use while at the facility.

¶52. The defendants owed Ben a duty to treat such foreseeable events in a non-negligent manner. Thus, the first question is whether the "wrongful conduct" rule, as a matter of law, bars the Cahns' claims that COPAC had a duty to use reasonable care to assess, monitor, and treat Ben on Sunday, December 18, 2011, after his first urine sample indicated the presence of Suboxone. We find *Meador v. Hotel Grover* controlling.

¶53. F.L. Meador brought a wrongful-death action, on behalf of Herman Meador. *Meador,* 9 So. 2d at 784. Herman went to the Hotel Grover for an illegal purpose – to use the services of a prostitute. The Hotel Grover gave permission to prostitutes to use the hotel to conduct business. At the hotel, Herman used the elevator. It malfunctioned, and Herman was fatally injured when he was crushed between the floors. *Meador,* 9 So. 2d at 784. The court ruled:

> [T]he defendant corporation accepted him on its elevator in said hotel as a passenger to carry him up to the floor on which said women were staying, and he was being transported upward by the defendant corporation, acting by its employee within the scope of his employ, when he suffered the injuries herein complained of, and at that time he was a guest of the defendant corporation and a guest of a guest of said defendant corporation.

24

*Id.*

¶54.    Defendant Sam Deloach told the night clerk "that Meador had been seriously injured by the elevator."  The clerk called the police and asked for officers to come to the hotel. When the officers arrived, the clerk motioned to Herman and said, "There he is, passed out." She directed that Herman be removed.  The officers mistakenly thought that Herman was drunk and did not understand he had been injured.  *Id.* at 785.  As a result, the court found that there was a claim against the hotel.  The court held:

> It was the duty of the hotel company to use reasonable care to see that one injured on its premises and by the operation of its business receives prompt and proper care and treatment to the end that his injuries, however occasioned, may not be aggravated by unnecessary and avoidable delay or inattention. Such care must be commensurate with the facilities available to the party charged and with the needs of the party injured, and such duty is heightened once the injured party is taken in charge by the other.

*Id.*  The court also ruled that "[p]utting aside the question whether the hotel as so operated must be viewed in the light of such status, we come at once to the question whether the deceased was injured while and as a result of engaging in an illegal act."  The court held:

> For a plaintiff to be barred of an action for negligent injury under the principle of public policy implicit in the maxim *ex dolo malo non oritur actio*, his injury must have been suffered while and as a proximate result of committing an illegal act.  The unlawful act must be at once the source of both his criminal responsibility and his civil right. The injury must be traceable to his own breach of the law and such breach must be an integral and essential part of his case.  Where the violation of law is merely a condition and not a contributing cause of the injury, a recovery may be permitted. *Western Union Tel. Co. v. McLaurin*, 108 Miss. 273, 66 So. 739. . . .
>
> *The mere status of a plaintiff as a lawbreaker at the time of his injury is not sufficient of itself to bar him from resort to the courts.* With respect to the particular act out of which the injury arose, his right to invoke the power of the law to protect can be neutralized only by the power of the law to punish.

25

Before he can be held in pari delicto with defendant he must first be in delicto. Regardless of the propriety for a private or public condemnation of one for a moral delinquency, matters which affect his personal character or reputation are no concern of the courts in their examination of his rights as a litigant. Plaintiff by his conduct did not place himself outside the law. He is not caput lupinum. IV Black Comm. 320. *Even illegality as such is but an abstraction and of itself neither causes injury nor creates disability. The status of the deceased as a violator of the law is thus made an irrelevant inquiry.*

*Meador*, 9 So. 2d at 786 (emphasis added).

¶55. We find that the "wrongful conduct" rule does not, as a matter of law, bar the Cahns' claims that COPAC had a duty to use reasonable care to assess, monitor, and treat Ben on Sunday, December 18, 2011, after his first urine sample indicated the presence of Suboxone.

### 4. The Defendants' Negligence or Criminal Acts that Led to Ben's Possession of Suboxone

¶56. The Cahns also argue that the "wrongful conduct" rule does not excuse the defendants' negligent, and certainly not their criminal, acts. They claim that *Price* does not apply because COPAC was aware that Ben was a drug addict and it knew he had a propensity for prescription-drug abuse. Thus, it accepted Ben as a patient with knowledge of the very illegal activity that it now claims bars his action. Also, the Cahns contend that a different result is necessary because, but for COPAC's and Dr. Gordon's criminal actions, Ben would not have been able to ingest the Suboxone.

¶57. The Cahns argue that COPAC and Dr. Gordon caused or contributed to Ben's death when they flagrantly violated the law in their possession and storage of the Suboxone, which made the drug accessible to Ben and ultimately killed him.

¶58. Dr. Gordon testified that, in or around the year 2003 or 2004, a COPAC nurse (at Dr.

Gordon's request) gave Dr. Gordon multiple sheets of expired Suboxone rather than properly disposing of the drug as required by law. Dr. Gordon claimed that he dispensed the drugs to indigent patients for several years until around 2006, 2007, or 2008 "maybe." Though he stopped this practice at some unspecified period between 2006 and 2008, for some reason the drugs remained in Dr. Gordon's unlocked desk drawer for several years until he discovered, on December 19, 2010, following Ben's death, that the drugs were missing. Since he kept no inventories of the drugs (in violation of state and federal laws) and kept no records of how much he dispensed or to whom he dispensed the drugs (in violation of state and federal law), Dr. Gordon could only estimate or speculate that he had four or five pads of the drugs containing about thirty pills per pad. In fact, Dr. Gordon admitted that his handling of Suboxone in this manner was in violation of applicable rules and regulations.

¶59. The Cahns claim that Suboxone is a Schedule II controlled substance and is subject to state and federal law. *See* Miss. Code Ann. § 41-29-117(A)(g) (Rev. 2013). Thus, any physician (Dr. Gordon) or medical provider (COPAC) that possesses and distributes Suboxone is subject to the Controlled Substances Act and must procure a license from the Drug Enforcement Administration. *See* 21 C.F.R. § 808, et. seq.

¶60. Further, because Dr. Gordon and COPAC were in possession of Suboxone, they were subject to strict inventory-control requirements and storage requirements. *See* 21 C.F.R. § 1304.11(a) ("Each inventory shall contain a complete and accurate record of all controlled substances on hand . . . ."); 21 C.F.R. § 1301.71(a) ("All [licensees] shall provide effective controls to guard against theft and diversion of controlled substances"); 21 C.F.R. §

27

1301.75(b) ("Controlled substances listed in Schedules II, III, IV, and V shall be stored in a securely locked, substantially constructed cabinet."). The failure to follow these regulations may expose the offender to civil penalties as strict liability and criminal sanctions for knowing or intentional violations. *See* 21 U.S.C. § 843(a)(4)(A) (2012) ("It shall be unlawful for any person knowingly or intentionally – to . . . omit any material information from . . . any application, report, record, or other document required to be made, kept, or filed under this subchapter or subchapter II of this chapter"); 21 U.S.C. § 843(d)(1) (2012) ("Except as provided in paragraph (2), any person who violates this section shall be sentenced to a term of imprisonment of not more than 4 years, a fine under title 18, or both[.]").

¶61.   In addition, COPAC, as a facility licensed to dispense medications, is governed by regulations promulgated by the Mississippi Board of Pharmacy and authorized by the empowering statute of Mississippi Code Annotated section 73-21-81 (Rev. 2012). Those regulations mandate that controlled substances shall be "maintained in a manner to deter loss by theft or burglary." MBP Regulations, Art. XXIV. Article XXIV(2)(B) specifically provides:

> In a nursing home or other institution which does not maintain a pharmacy, a securely locked, substantially constructed area shall be provided for storage of all controlled substances. Controlled substances left by the death or discharge of a patient shall be maintained in the drug storage area of the institution until proper disposition of such controlled substances is made. Controlled substances, thus maintained in the drug storage area, shall be kept in a locked cabinet, drawer, or other suitable locked container and only the consultant pharmacist or a person designated by the consultant pharmacist shall have access to the container.

28

Part 2(C) further provides that "expired medication must be secured." Similarly, Article XXV of the Mississippi Board of Pharmacy regulations requires that any and all controlled substances be subject to an annual inventory. Pursuant to Mississippi Code Annotated section 41-29-141 (Rev. 2013), Dr. Gordon and COPAC are subject to civil penalties for refusal or failure "to make, keep or furnish any record, notification, order form statement, invoice or information required under this article."

¶62. We recognize that the "wrongful conduct" rule is premised on Lord Mansfield's conclusion that "[n]o Court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act." *Price*, 920 So. 2d at 484 (¶13). There was no allegation in *Price* that the defendants had committed any illegal acts. Indeed, in the Mississippi cases that have considered the "wrongful conduct" rule, it does not appear that the defendants were engaged in "immoral or illegal acts." *Meador v. Hotel Grover* was the exception.

¶63. The Cahns have also argued that, even if the "wrongful conduct" rule is applicable, this Court should apply the "culpability exception."

¶64. In *Morrison v. McCann*, 301 F. Supp. 2d 641 (E.D. Mich. 2003), a federal court applied Michigan law and invoked the "culpability exception" to the "wrongful conduct rule." The plaintiff sued her former attorney for legal malpractice for his mishandling of the plaintiff's medical-malpractice claim against her former psychiatrist. *Id.* at 649. The psychiatrist had a sexual affair with his married patient (the plaintiff), and it ruined her family life. The attorney-defendant filed a motion for summary judgment. The defendant argued that adultery was a felony under Michigan law. Therefore, the plaintiff was barred

29

from recovery under the "wrongful conduct rule." *Id.* at 656.

¶65.    The federal court ruled "this dog will not hunt." *Id.*   The court then weighed the wrongful conduct of the psychiatrist against the felonious, i.e., adulterous, acts of the plaintiff to determine whether to apply the "culpability exception" to the wrongful conduct rule.  The court ruled that "[t]he culpability exception to the wrongful conduct rule exists where, although both parties engaged in illegal behavior, the parties are not equally culpable, and the defendant's culpability is greater than the plaintiff's." *Id.* at 658 (citations omitted). The court applied the exception and rejected the "wrongful conduct" rule.  The court gave significant weight to the fact that the psychiatrist was the plaintiff's physician when the affair began and that the plaintiff was in a vulnerable state.  Though the plaintiff indeed committed a felonious adulterous act and while Michigan recognized the "wrongful conduct" rule, the court determined that the application of the rule under such circumstances would be wrong because of the bad acts of the psychiatrist. *Id.* at 659-60.   We merely mention the "culpability exception" to the "wrongful conduct" rule.  We do not adopt it in Mississippi law or in this case.

¶66.    Here, we recognize that Ben was at COPAC for treatment for his propensity for prescription-drug abuse.  COPAC was paid to assist and treat Ben to help him overcome his drug addiction.  As discussed in *Hall*, COPAC, a residential addiction treatment facility, owes the same duty to inpatients in its care.  It is foreseeable that patients for prescription-drug abuse will attempt to secure prescription drugs if possible, and the defendants had a duty to legally possess Suboxone, to properly and securely store Suboxone, and to restrict

30

access to Suboxone from patients at COPAC. Here, Ben's death resulted from his addiction to and known propensity to abuse prescription drugs, the very reason he was placed in COPAC's care to begin with.

¶67.   We are also persuaded by the following ruling in *Price*:

> [I]f the plaintiff is a lawbreaker at the time of his injury, that alone is not enough to bar the plaintiff from recovery. This principle is consistent with tort law concerning duties owed to known trespassers and preventing use of spring guns from guarding property. The injury must be a proximate result of committing the illegal act. "The injury must be traceable to his own breach of the law and such breach must be an integral and essential part of his case. Where the violation of law is merely a condition and a not a contributing cause of the injury, a recovery may be permitted." The question is not merely when the wrongdoing was done, but what resulted from it. This Court has long held that if a plaintiff actually requires essential aid from his own illegal act to establish a claim, he has no case.

*Price*, 920 So. 2d at 485 (¶14).

¶68.   We find that Ben Cahn's death and the Cahns' claims are *not* wholly rooted in Ben's own transgressions taking place at the time his alleged injury occurred. Further, we find that the Cahns' claims do not absolutely require the essential aid from Ben's own misdeeds to establish their claims. Ben's violation of the law was merely a condition, and not an integral and essential part of his case. As a result, we do not find it necessary to consider the "culpability exception."

¶69.   To be clear, we do not find that the Cahns are entitled to a judgment as a matter of law. Further, we do not find that the Mississippi comparative-negligence statute abrogates the "wrongful conduct" rule. Instead, our ruling is limited to the conclusion that the "wrongful conduct" rule does not bar the Cahns' medical-malpractice claims.

31

¶70.    We reverse the summary judgment and remand the case for further proceedings.

> II.    *Whether the defendants waived their affirmative defense of the "wrongful conduct" rule.*

¶71.    The Cahns also argued that the defendants waived the affirmative defense of the "wrongful conduct" rule.  Based on the finding above, this issue is moot.

> III.    *Whether the trial court should have granted the plaintiffs' motions to compel.*

¶72.    The Cahns also argue that the trial court manifestly abused its discretion in disregarding their motions to compel.  To assist in the efficient resolution of this case, we also address this issue.

¶73.    To support their motions for summary judgment, the defendants offered the affidavit of Dr. Gordon and the deposition of Tom Kepner.  Both of which discussed the hearsay statements made by Ben's roommate C.T., who is now deceased.  Apparently, COPAC or Dr. Gordon has actual statements made by C.T. and has withheld the actual statements from production to the Cahns during discovery.  The Cahns filed two motions to compel, but the trial court did not consider these motions before ruling on the motion for summary judgment.

¶74.    The statements by C.T. appear to be relevant and crucial to the resolution of this litigation.  The defendants claim that the statements made by various employees, which were part of the COPAC peer review/quality assurance process, lost their privileged status if they ever were produced in discovery.

¶75.    COPAC relies on *Claypool v. Mladineo*, 724 So. 2d 373 (Miss. 1998), to withhold these documents.  It claims that any materials submitted to a quality-assurance or risk-

assessment committee are privileged. The Cahns claim that COPAC should not have been allowed to use *Claypool* as a shield to refuse to disclose relevant and material information, specifically statements by those staff members who were present on the night of Ben's death who were no longer employed by COPAC by the time the parties engaged in discovery in this matter. In *Claypool*, the supreme court clarified what was and was not covered by peer review proceedings pursuant to Mississippi Code Annotated sections 41-63-9 and 41-63-23 (Rev. 2013). The court held:

> The statute allows a plaintiff to discover information, documents or records otherwise discoverable from original sources. Miss. Code Ann. § 41-63-9(1) (Supp. 1997). This discovery should be conducted in accordance with and pursuant to the Mississippi Rules of Civil Procedure and the Mississippi Rules of Evidence. Further, persons who are members of a committee or were present at the committee proceedings are permitted to testify to matters within their own knowledge. Before a plaintiff may discover information, documents or records otherwise discoverable from original sources or depose a witness who is a member of a committee or present during committee proceedings, the plaintiff must know the identity of the original information and the original sources and those persons who were members of the committees or present during the proceedings.

*Claypool*, 724 So. 2d at 389. The court further clarified: "Information, records or documents submitted to peer review committees should not be privileged merely because they were presented to the committee. If a plaintiff can find the identical information from another source separate and outside of the peer review proceeding, he should be able to discover and use the evidence in his civil suit against the defendants." *Id.*

¶76. The Cahns argue that, in his deposition, Tom Kepner stated that among the materials he reviewed in preparation for his testimony was his notebook presented to the peer review committee regarding the incident. This notebook included a number of statements from

current and former employees present at the time of the subject incident. Thus, the Cahns raise Mississippi Rule of Evidence 612, which provides:

> If a witness uses a writing, recording or object to refresh his memory for the purpose of testifying, either (1) while testifying, or (2) before testifying, if the court in its discretion determines it is necessary in the interests of justice, an adverse party is entitled to have the writing, recording or object produced at the hearing, to inspect it, to cross-examine the witness thereon, and to introduce into evidence those portions which relate to the testimony of the witness.

¶77. On remand, the trial court may consider Mr. Kepner's deposition and determine whether "the interests of justice" entitle the Cahns to Mr. Kepner's entire notebook or certain parts thereof. Certainly special consideration shall be given as to what evidence related to C.T. should be disclosed.

¶78. Similarly, although we do not find the trial court abused his discretion, we find that the trial court should carefully consider the production of all documents related to C.T., including his medical records. C.T.'s statements to his medical and clinical providers appear to be relevant and may be the only admissible evidence of any conversations or actions taken by C.T. or Ben in the night and morning prior to Ben's death. Certainly Dr. Gordon's statement in his affidavit that C.T. told him "we broke into that office" is probative, relevant, and discoverable information.

¶79. We do not find that the trial court erred in failing to grant the motions to compel. We recognize that the trial court has the discretion to consider the motions as it deems necessary. However, in general, discovery motions should be addressed before the court considers a dispositive summary-judgment motion.

34

¶80. **THE JUDGMENT OF THE RANKIN COUNTY CIRCUIT COURT IS REVERSED, AND THIS CASE IS REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEES.**

**LEE, C.J., IRVING, P.J., BARNES, ISHEE, MAXWELL, FAIR, JAMES AND WILSON, JJ., CONCUR. CARLTON, J., CONCURS IN RESULT ONLY.**